IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| QUINTIN PHILLIPPE JONES, | § | |
| *Petitioner,* | § | |
| | § | |
| V. | § | |
| | § | Civil Action No. 4:05-CV-638-Y |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal | § | (death-penalty case) |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| *Respondent.* | § | |

**MEMORANDUM OPINION AND ORDER
ON PETITION FOR WRIT OF HABEAS CORPUS**

Quintin Phillippe Jones petitions for a writ of habeas corpus under 28 U.S.C. § 2254, contending that his state conviction and death sentence are unconstitutional.  The Court previously dismissed the application as time-barred but later reversed its decision based upon a change in the law.  *See Holland v. Florida*, 560 U.S. 631 (2010).  Having reviewed the parties' arguments and the complete record, the Court now denies the petition and dismisses this action with prejudice.

**BACKGROUND**

**I.  State-court proceedings**

The victim in this death-penalty case was Quintin Phillippe Jones's eighty-three-year-old great aunt, Berthena Bryant, who was beaten to death with a baseball bat in her home on September 11, 1999.  After speaking to neighbors, the police sought Jones for questioning about a man named Ricky Roosa, whom Jones had previ-

ously recruited to do yard work for Bryant. The police set up surveillance on the home of Jones's girlfriend, Paula Freeman. Jones was arrested on outstanding traffic warrants as he attempted to flee the home in a car driven by Freeman. While in police custody, Jones confessed to Detective Ann Gates that his alternate personality, "James," had murdered Bryant (the "Gates statement"). Nine days later, while still in custody and without a lawyer, Jones made another confession to Texas Ranger Lane Akin that he and Roosa had murdered two men during a drug deal six months earlier (the "Akin statement").

The Gates statement was admitted at trial, along with testimony describing Jones's whereabouts on the night of the murder, DNA evidence, and testimony that Jones had called Bryant's sister from jail and apologized for the murder. The prosecution ("the State") relied upon the Akin statement at sentencing, along with other evidence showing Jones's participation in the double murder, his juvenile criminal history, his gang membership, jail disciplinary infractions, and a diagnosis of psychopathic personality disorder. The defensive theory was that "James," not Jones, participated in the murder. The defense offered testimony that Jones had suffered a dysfunctional childhood and severe childhood abuse, which caused him to develop the alternate personality, drug and alcohol addic-

tion, and severe self-injuring behavior.  The jury convicted Jones and sentenced him to death.  (3 CR 408.)[1]

Jones pursued an appeal through new counsel.  (3 CR 459).  The Texas Court of Criminal Appeals ("CCA") affirmed the conviction. *Jones v. State*, 119 S.W.3d 766 (Tex. Crim. App. 2003).  The Supreme Court declined review.  *Jones v. Texas*, 542 U.S. 905 (2004).

Attorney Wes Ball was appointed to file Jones's state application for habeas-corpus relief, but he failed to do so.  The CCA relieved Ball, appointed Jack Strickland as substitute counsel, and set a new due date for the application.  *Ex parte Jones*, No. 57,299-01 (Tex. Crim. App. Dec. 3, 2003) (unpublished order). Strickland filed the application in 2004.  (SHR 2.)  Strickland filed the application thirty days late, but the CCA accepted it after finding good cause.  (1 SHR Supp. 2.)  The CCA denied habeas relief in 2005.  *Ex parte Jones*, No. WR-57,299-01, 2005 WL 2220030 (Tex. Crim. App. Sept. 14, 2005).

---

[1]The bound, state-court paper record is cited as follows:

| | |
|---|---|
| RR: | 39 volumes of the trial court reporter's record, preceded by volume number, followed by page number. |
| CR: | 3 volumes of the trial court clerk's record, preceded by volume number, followed by page number. |
| SHR: | unnumbered volume of habeas court clerk's record, followed by page number. |
| SHR Supp.: | 2 supplemental volumes of habeas court clerk's record, preceded by volume number, followed by page number. |

## II.  Federal Proceedings

Jack Strickland was appointed as federal habeas counsel. (Doc. 7.)[2] Strickland filed the federal petition in 2006, raising two grounds for relief, but the Court dismissed it as time-barred on the Respondent's unanswered motion to dismiss.  (Doc. 28.) Strickland did not appeal the dismissal.  After receiving communication from Jones that he did not wish to abandon the appeal, the Court appointed Lydia Brandt as substitute counsel in 2008.  (Doc. 31.)  The Court vacated the judgment of dismissal, and Ms. Brandt filed a response to the motion to dismiss.  (Docs. 43, 55.)  The Court again found the petition time-barred, however.  (Doc. 59.)

Jones appealed, and the appellate court remanded the case for consideration in the first instance of the Supreme Court opinion in *Holland*.  *Jones v. Thaler*, 383 F. App'x 380 (5th Cir. June 17, 2010).  On remand, the Court held for a third time that equitable tolling was not appropriate even under the less stringent *Holland* standard.  *Jones v. Stephens*, No. 4:05-CV-638-Y, 2013 WL 4223968 (N.D. Tex. Aug. 15, 2013).  (Doc. 101.)

In a post-judgment motion, however, Jones asserted for the first time that the magistrate judge's order appointing Jack Strickland contained provisions requiring that the petition be timely filed and that the petition demonstrate its timeliness under

---

[2] The electronic record is cited by CM/ECF number and .pdf page number (rather than any page numbers on the original document).

the statute.  (Doc. 103.)  After receiving supplemental briefing, the Court concluded that the provisions in the appointment order dictated a different result in the equitable-tolling analysis.  The Court vacated the dismissal order and reopened the case.  *Jones v. Stephens*, 998 F. Supp.2d 529 (N.D. Tex. 2014). (Docs. 106, 113.)

The Court ordered the parties to file amended briefing, as briefing on the substantive issues was nearly eight years old. Jones moved for a continuance, which the Court granted in part, and moved for funding, which the Court denied.  The amended petition was filed June 22, 2014, the amended answer was filed November 7, 2014, and Jones's reply was filed February 3, 2015.

## THE CLAIMS

Jones raises the following claims for relief:

1.  The trial court violated the Sixth Amendment by failing to timely appoint trial counsel.

2.  Trial counsel were ineffective under *Wiggins v. Smith*, 539 U.S. 510 (2003) by failing to adequately investigate and present mitigating evidence.

3.  Trial counsel were ineffective by failing to investigate and develop "condition-of-the-mind" evidence.

4.  Trial counsel were ineffective for failing to seek timely and relevant mental evaluations regarding the reliability of Jones's confession, his competency to stand trial, his criminal responsibility for capital murder, and his moral culpability and the appropriate punishment.

5.  The trial court violated the Fifth Amendment by admitting the Akin statement at sentencing.

Claims 1 and 5 were exhausted in state court.  Claims 2, 3 and 4, as well as an unnumbered subclaim in claim 1, are presented for

the first time in this Court.  The amended petition is subject to the standards set out in 28 U.S.C. § 2254 ("AEDPA"),[3] which are addressed where appropriate below.

CLAIMS LITIGATED IN STATE COURT

### I.  Claim 1:  The timeliness of counsel's appointment

Jones contends that the trial court violated the Sixth Amendment by failing to timely appoint counsel after his arrest.  The convicting state court ruled that this claim was barred on habeas review because Jones did not complain about the timeliness of counsel's appointment at trial and or on direct appeal.  In the alternative, the state court held that the claim lacked merit because: (1) during the time in which Jones was without counsel, formal adversary judicial proceedings had not been initiated, (2) Jones knowingly waived his rights and did not request counsel, and (3) Jones failed to show prejudice.  (2 SHR Supp. 38-42).  Based on the findings of the convicting court and its own review, the CCA denied habeas relief.

A. <u>Procedural bar</u>

Respondent first contends the claim is barred from federal review.  (Doc. 146, p. 38.)  The Court agrees.  Federal habeas courts do not review a federal claim decided by a state court if the state court decision rests on a state-law ground that is independent of a federal question and adequate to support the

---

[3] All subsequent citations to § 2254 are to 28 U.S.C. § 2254.

judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001).  The contemporaneous-objection rule is an adequate and independent state-law ground that procedurally bars federal habeas review.  *E.g., Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005); *Rowell v. Dretke*, 398 F.3d 370, 375 (5th Cir. 2005).  Likewise, the Texas "Gardner rule," which bars habeas review of record-based claims that were not raised on direct appeal, is also an adequate and independent bar to federal review.  *See Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004); *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996) (op. on reh'g).  Furthermore, when a state court rules that a claim is pro-cedurally barred, the fact that the court, as here, alternatively reached the merits of the claim does not vitiate the independent and adequate state procedural bar.  *See Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003).

Jones does not dispute that claim 1 was not raised in the trial court or on direct appeal.  He makes no argument to avoid a procedural bar based on *Coleman*.  (Doc. 149, p. 5-32).  Claim 1 is procedurally barred.  *See Coleman*, 501 U.S. at 729.

## B.  § 2254(d) determination

Respondent contends, in the alternative, that the state court's denial of the claim on the merits was not unreasonable.  Based on the following discussion, the Court agrees.

A claim adjudicated on the merits in state court may not be relitigated in federal habeas court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court. *See* § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). These determinations are limited to the record that was before the state court that adjudicated the claim on the merits. § 2254(d)(2); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). For purposes of § 2254(d)(1), "clearly established federal law" is the Supreme Court precedent that existed when the state conviction became final. *Williams v. Taylor*, 529 U.S. 362, 379-80 (2000). A state court's decision is "contrary to" Supreme Court precedent if the state court applies a rule that contradicts governing law or confronts facts that are materially indistinguishable from the relevant precedent and arrives at an different result. *Coleman v. Thaler*, 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). A state court decision is based on a "unreasonable application" of such law when the state court identifies the correct governing legal principle but applies it unreasonably to the facts of the case. *Id.* at 901-02.

Factual "determinations" in a state court decision are presumed correct, and a petitioner bears the burden of rebutting

them by clear and convincing evidence.  § 2254(e)(1); *see Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Titlow*, 134 S. Ct. at 15 (citing *Wood v. Allen*, 558 U.S. 290 (2010)).  Further, a "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); § 2254(d)(2).

Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Richter*, 562 U.S. at 102; *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (stating a merely wrong holding or even "clear error" will not suffice under § 2254(d)(1)).  Congress meant these conditions to be difficult to meet, and they stop short of imposing a complete bar on the relitigation of claims already rejected in state proceedings. *Richter*, 562 U.S. at 102.

### 1. Background facts

Bryant was found dead on the morning of Saturday, September 11, 1999.  Detective Ann Gates called on Jones at Freeman's home in an effort to speak to Jones about a man who did yard work for Bryant.  When no one answered, Gates left her business card on the door.  (4 RR 43, 69, 75, 115-16; 31 RR 109-11, 197.)  Jones had

outstanding traffic warrants, so Gates instructed police officers to set up surveillance on Freeman's house and arrest Jones if possible.  (4 RR 43-44; 31 RR 119-20.)   While the police were watching, Freeman drove up in her car, Jones came out of the house, jumped in the back of the car and kneeled down, and Freeman drove away.  The police stopped her at a gas station and took Jones into custody.  They found a syringe on the back floorboard where Jones had been hiding.  Jones was arrested at 4:45 p.m. on the outstanding warrants and for possession of a controlled substance.  (4 RR 36-41, 56-59, 70, 157-58; 29 RR 271-74.)

Gates began questioning Jones about 7 p.m.  (4 RR 72; 31 RR 123.)  Initially, she did not *Mirandize* Jones.  But she gave Jones written *Miranda* warnings about 9 p.m., after she noticed that Jones had no reaction to the news of Bryant's death.  (4 RR 74, 76-81; 31 RR 126-27, 183.)  The written warnings stated:

(1) You have the right to remain silent and not make any statement at all, and any statement you make may be used against you at your trial;

(2) Any statement you make may be used as evidence against you in court;

(3) You have the right to have a lawyer present to advise you prior to and during any questioning;

(4) If you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning;

(5) You have the right to terminate the interview at any time.

(SX 82; SPX 11.[4])   Jones waived these rights.   (4 RR 81.)

Jones then told Gates that he had been visiting various drug houses at the time of the murder.   He agreed to show Gates those locations on the following day, Sunday.   He agreed to take a polygraph examination on Monday.   Additionally, Jones named Ricky Roosa as the person who had done yard work at Bryant's house.   (4 RR 76, 87, 89, 92; 31 RR 132-33.)   This initial interview ended at 10:30 on Saturday evening.   (4 RR 81; 31 RR 133.)   Detective Gates then went to Freeman's home to collect the clothing that Jones had worn the previous day.   (4 RR 83-86; 30 RR 10; 31 RR 134.)   Freeman also gave Gates a photograph of Jones and Roosa.[5]   (4 RR 86-88, 162-66.)

On Sunday, September 12th, Jones showed Gates the locations that he had named in his alibi.   (4 RR 89-91; 31 RR 136.)   Gates returned Jones to the jail, and he agreed to talk with her again the next day.   (31 RR 137.)   Gates then proceeded to inquire at the locations that Jones had identified, and she concluded that his alibi was not checking out.   (4 RR 91.)   At 8:30 p.m., Jones appeared before a magistrate judge on the drug possession charge. The magistrate set bail and gave him the following written warnings:

---

[4] Trial court exhibits are cited as follows:
SX, DX:     State and defense trial exhibits (in 37 RR, 38 RR, 39 RR)
SPX, DPX:   State and defense pretrial exhibits (in 4 RR)

[5] On the back, in Jones's handwriting, it states:  "Road Dogs Killa, Li'l GQ, Red" and the words "Higher then a bitch."  (SPX 13; 4 RR 166-68.)

(1) You have a right to hire a lawyer and have him/her present prior to and during any interview and questioning by peace officers or attorneys representing the state.

(2) If you are too poor to afford a lawyer, you have the right to request the appointment of a lawyer to be present prior to and during any such interview and questioning.  You may have reasonable time and opportunity to consult your lawyer if you desire.

(3) You have the right to remain silent.

(4) You are not required to make a statement, and any statement you make can and may be used against you in court.

(5) You have the right to stop any interview or questioning at any time.

(6)  You have the right to have an examining trial.

(SPX 27.)  Jones apparently did not request a lawyer at this time.

At about 9 a.m. on Monday, September 13th, Detective Gates took Jones to the polygraph examination.  (4 RR 93.)  Meanwhile, his clothes that had been seized from Freeman's home tested positive for blood, and Gates prepared a search warrant for blood and hair samples.  (4 RR 93, 127; 31 RR 137; SPX 14.)  Gates then learned that Jones had failed the polygraph.  (4 RR 95.)  She began another interview about 1:22 p.m. with the intention of asking Jones for a written statement.  Jones received the *Miranda* rights for the third time and agreed to waive them.  He then dictated a written statement to a clerk typist.  (4 RR 95-97; 31 RR 138-47; SX 83; SPX 15.)  It contained a detailed alibi describing his efforts to find drugs.  (SPX 16; SX 84; 31 RR 147-57).  In the course of making this statement, Jones verbally affirmed that he understood

12

his right to have an attorney present but wanted to cooperate with the investigation. (31 RR 156; SX 84.) At 3:10 p.m., after the statement was completed, Jones's blood was drawn pursuant to a warrant. (4 RR 99-100; SPX 14.)

Gates and another detective continued speaking to Jones. Gates told Jones that his clothing had tested positive for blood, which would be compared to his aunt's, and she confronted him about the results of his polygraph. Jones began getting emotional, as if the pressure were mounting on him to tell the truth. He cried and said he was not feeling well but declined medical attention. Gates later acknowledged that it was possible Jones was going through drug withdrawal, but she did not know. (4 RR 100-01, 112; 31 RR 158-59, 186-87.) Jones then asked if they thought he needed a lawyer. They told him that it was his decision, and he responded, "I guess I want one." (4 RR 102; 31 RR 160.) At this point, Gates informed Jones that they could no longer talk to him, and she got up to leave. But Jones told Gates to stop. He told Gates to stay, asked the other detective to leave, and asked for a third officer, Detective Thornhill, to come into the room. (4 RR 102-03; 31 RR 160-61.) When these conditions were met, Jones proceeded to give a second written statement to Gates. (4 RR 103-04; 31 RR 161-62.)

In this statement, Jones said that he had another personality named James who killed his aunt with a baseball bat when he could not find his aunt's purse. (SX 85; SPX 17; the "Gates statement".)

13

Jones cried, apologized, and asked for help with his drug problem and mental problems.  (31 RR 192.)  The statement form provided, for the fourth time, written *Miranda* warnings.  Jones signed it at 5:30 p.m. on Monday, September 13th.  (4 RR 105, 139; 31 RR 163; SPX 17).  Gates then prepared a probable-cause affidavit, and Jones made his initial appearance on the Bryant capital murder charge. (4 RR 107-08; 31 RR 172-73; SPX 18, 19.)  The magistrate gave the same written warnings that Jones had received previously during his appearance on the drug charge.  Jones signed the warning form, but there is no indication that he requested counsel.  (SPX 19.)  He remained in the county jail.

Six days later, on September 19th, Jones again appeared before a magistrate judge and bail was revoked on two drug possession charges.[6]  He again received and signed written *Miranda* warnings from the magistrate on each charge.  (SX 144, 145.)

Meanwhile, the Texas Rangers had been investigating a double homicide in a neighboring county.  (4 RR 195; 34 RR 66-94.)  There had been little progress for months. Then Detective Gates received information from the probation officer for Jones's sister, Keisha, that Jones and Roosa were involved.  Based upon information obtained from Keisha, Ranger Lane Akin secured a search warrant for Freeman's house, which he executed with her consent in the early

---

[6] One charge appears to relate to the syringe found at the time of arrest, and the other appears to relate to an arrest the previous June while Jones and Roosa were at a gas station.  (35 RR 17; 36 RR 25-29.)

morning hours of September 22nd.  (SX 131, 132; SPX 28, 29; 4 RR 169-72, 195-96, 247; 34 RR 94-96, 128; 35 RR 92-101.)

Akin left the search on September 22nd to interview Jones.  (4 RR 225; 34 RR 134.)  He informed Jones that he was investigating the murders of Marc Sanders and Clark Peoples.  Jones admitted he knew the victims but denied any involvement.  Akin asked Jones what he would say if they told him that Roosa said Jones was the "bad guy" primarily responsible for the murders.  At that point, Jones cried and orally admitted his involvement in the murders.  (4 RR 226-29; 34 RR 137-38.)  Jones described the murders as Akin wrote down what he said on a statement form, asking questions as they went along.  The statement form contained written *Miranda* warnings, however, Akin explained the warnings to Jones only after the state-ment was written out (but unsigned). (4 RR 230-45; 34 RR 139-43; SX 133; SPX 30 (the Akin statement)).

Over the next two days, September 23rd and 24th, Jones accom-panied investigators to the river location where the bodies of Sanders and Peoples had been found.  Along the way, Jones sponta-neously identified places connected to the crime.  (4 RR 255, 275.) Eleven days later, on October 5, 1999, Jones signed a form request-ing counsel.  Rex Barnett was appointed that day.  (1 CR 15.)

After a two-day hearing, the trial court suppressed the oral statements Jones had made while driving around with Gates and with the investigators of the double murder.  (6 RR 17, 21.)  The Gates

statement was admitted at the guilt stage of trial, and the Akin statement was admitted at sentencing. (SX 85; SX 133; 31 RR 164; 34 RR 143.)

### 2. Analysis

Jones argues that counsel should have been appointed at each of his magistrations: September 12 (the drug charge), September 13 (Bryant capital murder charge), and September 19 (the two drug charges). He also contends that counsel should have been appointed before the blood draw and all custodial interrogations, as these were "critical stages" of the proceedings. (Doc. 129, p. 47-49; doc. 149, p. 13.) The Court evaluates the state-court ruling on the merits under the deferential standards in § 2254(d).

The controlling Supreme Court precedent states that the Sixth Amendment right to counsel attaches when the adversarial judicial process is initiated, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)); *see Michigan v. Jackson*, 475 U.S. 625, 629 (1986), *overruled on other grounds*, *Montejo v. Louisiana*, 556 U.S. 778, 797 (2009)[7]. The right to counsel does not depend upon a request by the defendant. *Brewer*, 430 U.S. at 404; *Crawford v. Beto*, 383 F.2d 604, 605 (5th Cir. 1967). This does not mean,

---

[7] The overruling of *Jackson* does not affect the rule regarding when adversary judicial proceedings begin. *See Rothgery v. Gillespie Co.*, 554 U.S. 191, 198 (2008).

however, that counsel must be appointed for a defendant at the moment his right attaches. Rather, once the right attaches, a defendant must have counsel present at all "critical" stages of the criminal proceedings. *United States v. Wade*, 388 U.S. 218, 224 (1967); *Powell v. Alabama,* 287 U.S. 45, 57 (1932). Interrogation by the State is such a stage. *Massiah v. United States*, 377 U.S. 201, 204-05 (1964). A blood draw, as Jones concedes in his reply, is not. *Wade*, 388 U.S. at 227-28; (doc. 149, p. 22, n.2.) Further, the right to counsel is offense-specific and does not attach to uncharged offenses. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001) (declining to expand Sixth Amendment right to "factually related" offenses). For suspects who are not charged, they retain the ability under *Miranda* to obtain counsel and refuse police questioning. *Cobb*, 532 U.S. at 171, n.2.

The right to counsel may be waived, so long as the waiver is voluntary, knowing, and intelligent. *Patterson v. Illinois*, 487 U.S. 285, 292, 292 n.4 (1988). Generally speaking, when a defendant is admonished of his rights according to *Miranda* and agrees to waive those rights, the waiver of his Sixth Amendment rights will be considered a knowing and intelligent one. *Id.* at 296. The waiver may be direct or, "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *See North Carolina v. Butler*, 441 U.S. 369, 373

(1979).  Whether there has been a knowing, intelligent, and volun-
tary waiver of the right to counsel depends on the particular facts
and circumstances surrounding the case, including the background,
experience, and conduct of the accused.  *Id*. at 374-75 (citing
*Johnson v. Zerbst*, 304 U.S. 458 (1938)).  Waiver may not be pre-
sumed, but "once it is determined that a suspect's decision not to
rely on his rights was uncoerced, that he at all times knew he
could stand mute and request a lawyer, and that he was aware of the
State's intention to use his statements to secure a conviction, the
analysis is complete and the waiver is valid as a matter of law."
*See Moran v. Burbine*, 475 U.S. 412, 422-23 (1986) (addressing
*Miranda* waiver).

Jones's Sixth Amendment right to counsel attached in this
capital murder case when he made his initial appearance on
September 13th.  At that time, Jones was formally charged with
capital murder.  The Gates statement occurred prior to that attach-
ment, as did the blood draw (which is not considered a critical
stage anyway).  The Akin statement occurred after attachment, but
the Akin interrogation involved a different, uncharged offense.
There is no suggestion in the record or briefs that law enforcement
resorted to physical or psychological pressure to elicit Jones's
statements, nor is there any question about Jones's comprehension
of the *Miranda* warnings, which he had received multiple times, or
the potential consequences of a decision to relinquish those

18

rights. (4 RR 95-108, 133-43, 226-48; 31 RR 138-95; 34 RR 135-60.) In fact, the available evidence suggests the opposite. The defense expert testified at sentencing that Jones was not suggestible and that there was no evidence to conclude that "the statements he gave to the police were in any way as a result of some kind of undue susceptibility on his part to their interrogation procedures." The expert did not think Jones's statements were in any sense coerced. (35 RR 150, 181.)

The state habeas court was not unreasonable when it concluded that Jones's Sixth Amendment rights had not attached when he was cooperating with law enforcement and that, even if they had attached, Jones voluntarily, intelligently, and knowingly waived them. *See Montejo*, 556 U.S. at 789 (holding that "no reason exists to assume that a defendant . . . who has done *nothing at all* to express his intentions with respect to his Sixth Amendment rights, would not be perfectly amenable to speaking with the police without having counsel present") (emphasis in original).

Jones argues, however, that *Maine v. Moulton*, 474 U.S. 159 (1985) is the controlling Supreme Court precedent. He argues that the police violated the Sixth Amendment by arresting him on traffic warrants to create an opportunity to interrogate him without counsel about Bryant's murder. According to Jones, he was *de facto* arrested for the Bryant murder on the 11th, and his right to counsel was first triggered by his initial appearance before the

19

magistrate on the 12th (for the drug charge). (Doc. 129, p. 45-48.) The Court also understands Jones to rely upon *Moulton* for the assertion that Ranger Akin violated the Sixth Amendment when he interviewed Jones about the Sanders/Peoples murders on September 22nd. (Doc. 149, p. 25-26). The argument here is that Akin's interrogation was a critical stage in the Bryant capital murder proceedings, as Akin must have known that a confession to the Sanders/Peoples murders could be useful proof of future dangerousness in the Bryant murder prosecution. The Court does not read *Moulton* to support any of these arguments.

To be clear, the record does not unequivocally establish that Jones was arrested on traffic warrants because he was a suspect in Bryant's murder. Gates testified that she wanted to speak to him about people he had brought to his aunt's house to do yard work. It was only after speaking to Jones for a while that Gates learned Jones was in the neighborhood on the night of the murder. (4 RR 75, 115; 31 RR 110, 121, 125-26, 197-98.)[8] But, assuming his arrest on traffic warrants was a pretext to place him in custody

---

[8] Jones's asserted facts on this point are incorrect. He contends that, when Detective Gates sought Jones at Freeman's home, Jones was not there but Freeman was present and interviewed by Detective Gates. (Doc. 149, p. 15.) Actually, nobody answered the door at Freeman's home, and Gates left her business card. Gates was able to interview Freeman later that day because Freeman willingly followed the police to the station after they had stopped her and arrested Jones, who was hiding in the back of her car. (4 RR 69, 161-62, 180-82.)

for questioning about the murder, *Moulton* does not provide autho-
rity for a *de-facto*-arrest rule.

Jones contends that *Moulton* stands for the general rule that
the police violate the Sixth Amendment when they intentionally
create an opportunity to confront the accused without counsel being
present. (Doc. 149, p. 14-19). The holding in *Moulton* is not so
broad. In *Moulton,* the police used a co-indictee to elicit incri-
minating statements from Moulton. Moulton was indicted for theft;
thus, there was no dispute that Moulton's Sixth Amendment right to
counsel, unlike Jones's, was attached in the theft case when he
made the incriminating statements. *Moulton* did not need to
address, and did not purport to address, *when* the Sixth Amendment
right attached. Rather, the critical issue was whether the Sixth
Amendment violation (caused by the police using a co-indictee to
circumvent Moulton's right to have counsel present) could be cured
by the fact that the police used the co-indictee to also investi-
gate new offenses *to which there had been no Sixth Amendment
attachment*, namely threats to the co-indictee and a short-lived
plan to murder witnesses in the upcoming trial. The government
argued that law enforcement had the right and duty to investigate
these new offenses by using the co-indictee, which cured any impro-
prieties under the Sixth Amendment. The Supreme Court disagreed:

> To allow the admission of evidence obtained from the
> accused in violation of his Sixth Amendment rights
> whenever the police assert an alternative, legitimate
> reason for their surveillance invites abuse by law

enforcement personnel in the form of fabricated investi-
gations and risks the evisceration of the Sixth Amendment
right recognized in *Massiah*. *On the other hand, to
exclude evidence pertaining to charges as to which the
Sixth Amendment right to counsel had not attached at the
time the evidence was obtained, simply because other
charges were pending at that time, would unnecessarily
frustrate the public's interest in the investigation of
criminal activities*. Consequently, incriminating state-
ments pertaining to pending charges are inadmissible at
the trial of those charges, notwithstanding the fact that
the police were also investigating other crimes, if, in
obtaining this evidence, the State violated the Sixth
Amendment by knowingly circumventing the accused's right
to the assistance of counsel.

*Moulton*, 474 U.S. 180 (emphasis added) (footnote omitted).  Thus,

*Moulton* does not address or support Jones's assertion that his

right to counsel attached in the Bryant murder prosecution when he

was arrested on the traffic warrants.

Moreover, *Moulton* does not support Jones's argument that

Ranger Akin violated the Sixth Amendment by questioning him without

counsel about a different, uncharged double murder.  These facts

were not present in *Moulton,* as the statements admitted at

Moulton's trial were "principally those involving direct discussion

of the thefts for which Moulton was originally indicted."  *Id.* at

167.  *Moulton* did not address the admissibility of Moulton's state-

ments regarding his inchoate plan to kill witnesses, as the

prosecution did not offer those statements.  *Id.*  If anything, the

italicized language quoted above suggests that the exclusion of the

Akin statement, simply because other charges were pending at the

22

time, would unnecessarily frustrate the public's interest in the investigation of new crimes.

Jones cites cases from the Illinois Supreme Court, the Delaware Supreme Court, and the Texas Court of Criminal Appeals to support his argument. *Wesbrook v. State,* 29 S.W.3d 103, 118 (Tex. Crim. App. 2000); *People v. Kidd*, 129 Ill.2d 432, 452, 544 N.E.2d 704, 712-13 (1989); *Jackson v. State*, 643 A.2d 1360, 1372 (Del. 1994). These cases extend *Moulton* to prohibit the admission at sentencing of post-attachment statements obtained from the accused that relate to an uncharged offense. These cases are based on dicta in a *Moulton* footnote and are otherwise questionable. *See, e.g., Thompson v. State*, 108 S.W.3d 269, 270 (Tex. Crim. App. 2003) (Keasler, J., concurring and dissenting) (advocating overruling *Wesbrook*); *Frye v. Commonwealth*, 231 Va. 370, 391-92, 345 S.E.2d 267 (Va. 1986) (holding that the *Moulton* proscription against the knowing circumvention of the right to counsel extends only to pending charges concerning which the right has attached); *State v. Lale*, 141 Wis.2d 480, 487, 415 N.W.2d 847 (Wis. Ct. App. 1987) (holding that *Moulton* does not stand for the proposition that initiation of formal proceedings on one set of charges creates a Sixth Amendment right to counsel on other unfiled charges).

In any event, state-court decisions do not establish controlling precedent for federal habeas review. And controlling federal precedent includes only the holdings, as opposed to the dicta, of

Supreme Court decisions. *White v. Woodall*, 134 S. Ct. 1697, 1701 (2014). Accordingly, Jones's interpretation of *Moulton* does not control claim 1.

The state court here ruled that no Sixth Amendment right had attached when Jones cooperated with law enforcement. It held in the alternative that Jones knowingly waived his rights and did not request counsel. Jones has not met his burden under § 2254(d) to show that these rulings were "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

### C. *Brecht* prejudice analysis

Respondent alternatively contends that, regardless of any error, Jones is not entitled to relief because he has not shown prejudice. Under federal law, the harmless-error analysis asks whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *See Hopkins v. Cockrell*, 325 F.3d 579, 585 (5th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619 637-38 (1993)). This stringent standard compels habeas relief only if the constitutional error resulted in "actual prejudice." *See Brecht*, 507 U.S. at 637. If the error did not influence the jury, or had but very slight effect, the conviction should stand. *See O'Neal v. McAninch*, 513 U.S. 432, 437 (1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

24

(1946)).  If the Court is in "grave doubt" about whether the error had a substantial and injurious effect, then the error is not harmless. *Id*. at 436.

Jones contends that the admission of the Gates statement at his trial was the equivalent of being forced to represent himself and that prejudice should be presumed under *White v. Maryland*, 373 U.S. 59 (1963) because nothing counsel could do at trial could ever cure the one-sided confrontation that resulted in his confession. (Doc. 149, p. 22).  *White* is inapposite, however, because it involved an uncounseled guilty plea, where the degree of prejudice can never be known because only counsel could have enabled the accused to know all the defenses available before he plead guilty. *White*, 373 U.S. at 60 (citing *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961)).  The alleged error in this case is the admission of an uncounseled confession during the presentation of the case to the jury.  This would be constitutional trial error which "is amenable to harmless-error analysis because it may be quantitatively assessed in the context of other evidence presented." *Brecht*, 507 U.S. at 629 (ellipsis and internal quotes omitted).  The Court therefore does not presume prejudice.

Jones also argues that, by the time he was appointed counsel, he had confessed to all three murders such that his conviction and death sentence were foregone conclusions.  Respondent contends that

other, overwhelming evidence at the guilt and punishment phases rendered any error harmless.

Overwhelming evidence of guilt can render constitutional trial error harmless. *E.g. Burgess v. Dretke*, 350 F.3ed 461, 472 (5th Cir. 2003). The Court finds such evidence in this case. Freeman testified that Jones never came home after she drove him to his aunt's neighborhood on the night of her murder. (29 RR 270-71; 31 RR 73.) Tiffany testified that she took Jones to his aunt's house, and when Jones returned, he had acquired $30 for drugs and was "wide-eyed and scared" and looking over his shoulder. (31 RR 73-79.) After Detective Gates left her card on his door, Jones demonstrated a guilty conscience by convincing Freeman to leave work early and attempting to flee by hiding in the backseat of her car. (29 RR 271-74.) DNA consistent with the victim's DNA was found on Jones's clothing.[9] (30 RR 192-93.) And, while in jail and represented by counsel, Jones called Mattie Long and apologized for the killing. (29 RR 55-56.)

The Court similarly concludes that, given the other evidence of Jones's future dangerousness, including evidence of his participation in the Sanders and Peoples murders, the admission of the Akin statement at punishment did not prejudice Jones.

---

[9] The Court includes the blood evidence in this analysis because Jones's clothes, containing visible blood and tissue, were seized from Freeman's house with her consent. (30 RR 13, 18, 32; 4 RR 83, 165.) The uncounseled blood draw that Jones complains about in this claim only tied him to his own bloodstain on a washcloth found in Freeman's home, with no obvious connection to the murder. (30 RR 51, 161, 193.)

Freeman's son testified that, one day during a time when Roosa lived with them, Jones asked him and his brother to go to a friend's house because Jones and Roosa might do something bad that Jones "would have to go to jail for."  The boys played down the street for a while, and a black car drove up to their house.  When they returned home, the black car was gone, nobody was home, and there was blood on the floor and wall.  Using Luminol, the police later found blood stains on the floor and wall near the couch, as well as the couch itself.  (34 RR 54-58, 172-77).  Freeman testified that when she found the blood stains in her house, Jones told her that he had been in a fight with a friend.  But the next time she saw him, he wanted money to leave town.  (35 RR 14-16).

Jones's sister, Keisha, gave her probation officer and Ranger Akin information that she had received directly from Jones regarding his participation in the Sanders and Peoples murders.  Keisha acknowledged much of that information in her testimony, but said Jones only acted because Roosa had threatened Freeman and her kids.  Keisha testified that Jones told her he had been talking to Peoples about buying drugs when Roosa hit Peoples on the head with a barbell.  They tied Peoples around the neck and took his money, jewelry, and cocaine.  Jones then went out to the car and talked Sanders into coming into the house, luring him to his death.  Jones and Roosa then loaded the bodies into the car and left.  (35 RR 93-101).  In addition to the testimony of Freeman, Freeman's son, and

Keisha, mental-health experts for both the State and the defense spoke frankly about Jones's participation in the double murder, based on his statements during his evaluations. (35 RR 201-03; 36 RR 84-85.)

The jury's future-dangerousness finding was also supported by the brutal bludgeoning of the victim, an elderly relative of Jones, Jones's involvement in the Hoova Crips gang, and his juvenile history, including an assault on two teachers, possession of a handgun, and setting fire to another student's hair. Given all the other evidence presented at trial, Jones fails to show that his uncounseled confessions had a substantial influence on the jury's verdict. *See O'Neal*, 513 U.S. at 437. He fails to demon-strate prejudice under *Brecht.*

In sum, claim 1 is procedurally barred. The Court also holds, in the alternative, that the state court's denial of the Sixth Amendment claim was not unreasonable, and alternatively, there is no *Brecht* prejudice. The Court denies claim 1.

## D. Claim 1a

In a related, unnumbered claim ("claim 1a"), Jones contends that trial counsel rendered ineffective assistance by failing to assert this Sixth Amendment violation at trial. (Doc. 129, p. 50.) Respondent does not address this new claim in his answer. In his Reply, Jones argues that the subclaim is not limitations-barred because it relates back to claim one. He also argues that his

28

failure to exhaust does not result in procedural default because state habeas counsel's ineffectiveness excuses any default. Jones contends the claim may be reviewed by this Court *de novo*. (Doc. 149, p. 5-11.)

Under the AEDPA's exhaustion requirement, a federal court may not grant habeas relief unless it appears that the applicant has exhausted the remedies available in the courts of the state. *See* § 2254(b)(1)(A); *Richter*, 562 U.S. at 103. This requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court. *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (quoting *Mercadel v. Cain*, 179 F.3d. 271, 275 (5th Cir. 1999)). "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *See* § 2254(b)(3); *Woodfox v. Cain*, 609 F.3d 774, 792-793 (5th Cir. 2010). An application for habeas relief may be denied on the merits, notwithstanding the failure of the applicant to exhaust state remedies. § 2254(b)(2).

When a claim has not been exhausted, and the state court to which the petitioner would be required to present his claim in order to meet the exhaustion requirement would now find the claims procedurally barred, the claim is defaulted for purposes of federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Williams v. Thaler*, 602 F.3d 291, 305 (5th Cir. 2010). For

unexhausted claims of ineffective assistance of trial counsel that are deemed "substantial," however, the ineffective assistance of state habeas counsel may excuse any procedural bar. *See Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012). A claim is "substantial" if it has "some merit." *Martinez*, 132 S. Ct. at 1318.

The Court need not address the arguments lodged by Jones to surmount limitations and procedural default because the record is sufficient to review and deny this claim on the merits. *See Busby*, 359 F.3d at 720 (noting that habeas court may look past any procedural default if the claim may be resolved more easily on the merits); *Barksdale v. Quarterman*, No. 3:08-CV-736, 2009 WL 81124, at *3, n.4 (N.D. Tex. Jan. 9, 2009) (Kinkeade, J.) (noting that Court need not address alleged limitations bar because claims lack merit); *Russell v. Cockrell*, No. 3:01-CV-1425, 2003 WL 21750862, at *3, n.3 (N.D. Tex. July 25, 2003) (Fitzwater, J.) (holding that court need not address potential limitations bar where claim has no merit). This claim against trial counsel is a derivative claim; it has merit only to the extent the Sixth Amendment claim upon which it is based has merit. The Court has already addressed Jones's Sixth Amendment argument and rejected his interpretation of *Moulton*. The Court did so under the deferential standard of review in § 2254, however, a *de novo* review yields the same conclusions

30

for the same reasons.   The Court also concluded that any error would be harmless under *Brecht*.

Therefore, trial counsel were not ineffective for failing to lodge a Sixth Amendment objection at trial.   *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (holding that *Strickland* does not require counsel to make futile motions or objections); *Romero v. Lynaugh*, 884 F.2d 871, 879 (5th Cir. 1989) (holding that counsel is not ineffective for failing to block the receipt of evidence that is clearly admissible).   The Court concludes that claim 1a has no merit and that the procedural-bar exception in *Martinez/Trevino* is unavailable because the claim is not "substantial."   The Court denies claim 1a.


## II.   Claim 5: The Akin statement

The CCA on direct appeal ruled that the admission of the Akin statement during the punishment phase violated Jones's Fifth Amendment rights as protected by *Miranda*, but concluded that it was harmless error under *Chapman v. California*, 386 U.S. 18 (1967).   In claim 5, Jones challenges the *Chapman* analysis.

The CCA first held that Jones's waiver of his Fifth Amendment rights was constitutionally invalid under the circumstances.   The State had argued under *Elstad* that Jones's written confession, signed after *Miranda* warnings were properly given and waived, need not have been suppressed solely because Akin had obtained the

31

earlier, unwarned (but voluntary) oral confession. *See Oregon v. Elstad*, 470 U.S. 298 (1985).  The CCA disagreed and distinguished *Elstad,* concluding that Jones did not give two statements but gave one unwarned statement, observing "at the very least, a serious misunderstanding by law enforcement . . . of the dictates of *Miranda*." *Jones*, 119 S.W.3d at 773-75.

But the CCA found the error harmless after a lengthy analysis. It first noted that the sentencing phase of trial does not focus on whether Jones committed the extraneous murders, but on whether he would probably commit future criminal acts of violence that would constitute a continuing threat to society and whether there are sufficient mitigating circumstances to warrant a life sentence rather than a death sentence.  With this background, the CCA concluded:  (1) the State established Jones's involvement in the extraneous murders through several witnesses independent of the Akin statement, 2) other evidence supported the jury's answer to the special issues, namely the brutal beating of his kindly aunt, several assaultive juvenile offenses, and his gang membership, (3) the content of the statement itself included self-serving asser-tions that Roosa was the primary actor and that Jones simply followed Roosa's directions which, if believed by the jury, mitigated Jones's responsibility and supported the defensive theory that Roosa set Jones down the path toward his alter ego's murder of his aunt, (4) the State only mentioned the Akin statement twice

during closing arguments, one of which was "troubling" but never-theless dismissed as a rhetorical flourish in response to the defense argument, and (5) there were no collateral implications detrimental to Jones's overall mitigation case, which rested on an asserted dissociative mental disorder, and Jones did not dispute at trial or on appeal that he had, in fact, participated in the Sanders/Peoples murders. *Jones*, 119 S.W.3d at 777-83.

Jones contends that this ruling was unreasonable in law and fact because (1) the "clearly established federal law" is a four-Justice holding in *Arizona v. Fulminante*, 499 U.S. 279 (1991) that the harmless-error rule does not apply to erroneously admitted coerced confessions, (2) the CCA underestimated the prosecutors' emphasis on the Akin statement, and (3) the CCA's finding that the Akin statement contained "a wealth of mitigating facts" is unreaso-nable because the statement implicated Jones in the double murder. (Doc. 129, p. 107-09, 114). Respondent argues that the CCA pro-perly conducted its inquiry under *Chapman*. (Doc. 146, p. 80-84).

In *Chapman*, the Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. The State bears the burden of proving that an error passes muster under this standard. *Id.*; *Brecht*, 507 U.S. at 630. The parties agree that the Court reviews the state court's *Chapman* analysis for reasonableness under the

33

deferential standard of review in § 2254(d).  (Doc. 129, p. 104; doc. 146, p. 81.)   In conducting this review, the CCA's ultimate decision is tested, not every jot of its reasoning.  *Morrow v. Dretke*, 367 F.3d 309, 314 (5th Cir. 2010) (citing *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001)).

For two reasons, the Court initially disagrees that the four-justice holding in *Fulminante* is the applicable federal law. First, *Fulminante* addresses coerced confessions that violate the Fifth and Fourteenth Amendments.  The error found in this case, on the other hand, was a violation of *Miranda*, which requires the exclusion of unwarned statements even if they are voluntary and not coerced.  *Jones*, 119 S.W.3d at 772-76 (analyzing this claim under *Miranda* and *Elstad* not *Fulminante*); *see Elstad*, 470 U.S. at 307. In a nutshell, the CCA found that Jones's waiver of his rights was constitutionally invalid because Akin did not *Mirandize* Jones before questioning him.  *Jones*, 119 S.W.2d at 775.  While inadmissible, such non-*Mirandized* statements are not necessarily involuntary or coerced within the meaning of *Fulminante*.  *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (noting that the disadvantage of the *Miranda* rule is that statements which may be by no means involuntary may nonetheless be excluded).  In this very case, for example, the defense expert did not think Jones's statements resulted from undue susceptibility to police interrogation procedures.  (35 RR 150.)

34

Second, even if *Fulminante* applied, Jones's interpretation of its holding does not withstand scrutiny.  For support, Jones cites *Panetti v. Quarterman*, 551 U.S. 930 (2007) and its application of *Marks v. United States*, 430 U.S. 188 (1977).  *Marks* holds, according to *Panetti*, that when there is no majority decision, the narrower holding controls.  *Panetti*, 551 U.S. at 949 (citing *Marks*, 430 U.S. at 193).  As Jones acknowledges, the *Fulminante* Court was not fragmented on the matter of whether a harmless-error analysis should apply.  Five Justices agreed that a harmless-error analysis *should* apply to the erroneous admission of a coerced confession, though a different majority found the error harmful, resulting in a reversal of Fulminante's conviction.  The Court therefore disagrees with Jones that the alleged error in this claim is structural error under *Fulminante*.  *Fulminante*, 499 U.S. at 309 (noting that admission of involuntary confession is classic trial error); *see also Neder v. United States*, 527 U.S. 1, 18 (1999).

The Court next addresses Jones's argument that the CCA under-estimated the State's emphasis on the error.  His argument on this point is conclusory; he reiterates the prosecutors' closing arguments that the CCA specifically quoted and addressed, and then concludes the CCA failed to give appropriate consideration and weight to the facts.  Mere disagreement with the state court does not demonstrate unreasonableness.  *See Orman v. Cain*, 228 F.3d 616, 619 (5th Cir. 2000).  Jones also points to an exchange on cross-

35

examination between his counsel and Ranger Akin, in which Akin concedes he did not give Jones *Miranda* warnings prior to questioning.  (Doc. 129, p. 114); (34 RR 148).  Jones does not clarify how defense counsel's cross-examination can affect an analysis of the *State's* emphasis of the error.  Even if it could, the exchange does not discuss the contents of the statement but rather the circumstances surrounding its production.

Next, Jones asserts that the CCA improperly credited mitiga- ting facts contained within the Akin statement.  The essence of this argument is that a harmless-error analysis must overlook factors that do not favor Jones's position.  Jones provides no clearly established federal law that a harmless-error analysis cannot consider the total impact--both the good and the bad--of the erroneously admitted statement.  On the contrary, a review under *Chapman* considers the "trial record as a whole."  *See United States v. Hasting*, 461 U.S. 499, 509 (1983).  The state-court ruling is not unreasonable for crediting mitigating facts in the Akin statement.

Jones makes two additional arguments in his reply.  He asserts that the emphasis on other evidence showing Jones's participation in the murders is improper because the CCA should not have assumed that the State could have proven Jones's participation in the double murder without the Akin statement.  To the extent that Jones may be suggesting that *Miranda* requires suppression of the "fruits"

36

of an unwarned statement, the Supreme Court has rejected this argument where the unwarned statement is voluntary. *See United States v. Patane*, 542 U.S. 630, 639 (2004) (citing *Elstad*, 470 U.S. at 307). Moreover, in this case, the other evidence showing Jones's participation in the double murder were not "fruits" of Jones's unwarned statement but flowed from Keisha's statements to her probation officer and the independent recollections of Freeman and her son, all of which are untainted by any constitutional violation. (4 RR 247; 34 RR 94-96.)

Finally, Jones complains that Respondent's argument fails to acknowledge the devastating impact a confession has on the jury. The CCA opinion, however, "emphasizes that a defendant's confession is generally likely to have a profound impact on a jury" and concluded specifically that the Akin statement did not carry the weight a confession might normally bear. *Jones*, 119 S.W.3d at 780, 783. Jones's suggestion that this concept was overlooked by the CCA is not supported by the record.

Jones fails to demonstrate that the CCA's *Chapman* analysis was unreasonable. The Court denies claim 5.

## CLAIMS NOT PRESENTED IN STATE COURT

### I. Claims 2, 3, and 4

In claim 2, Jones asserts that trial counsel rendered ineffec-
tive assistance under *Wiggins v. Smith* by failing to sufficiently
investigate mitigating information about Jones's life. (Doc. 129,
p. 52).  In claim 3, Jones alleges that counsel failed to develop
condition-of-the-mind evidence that could have negated the *mens rea*
and lessened Jones's moral culpability in the punishment phase.
(Doc. 129, p. 79).  In claim 4, Jones argues that counsel failed to
conduct an adequate life-history investigation, causing his experts
to provide unreliable evaluations on sanity, competency to confess,
competency to stand trial, and mental-health based mitigation.
(Doc. 129, p. 91.)

Respondent initially contends these claims are barred by the
statute of limitations.  (Doc. 146, p. 22.)  Jones replies that the
same facts that justified equitable tolling for the original peti-
tion justify equitable tolling for these new claims.  Jones also
argues that it would violate the interests-of-justice standard for
the substitution of counsel to limit his claims to those raised in
the original petition, given that this Court removed original
federal counsel and later concluded (for purposes of equitable
tolling) that the attorney-client relationship was mutually
undesired.  *See Martel v. Clair*, 132 S. Ct. 1276 (2012).  Jones
argues that limiting his claims to those raised in the original

petition would violate *Christenson v. Roper*, 135 S. Ct. 891 (2015), which requires the substitution of federal counsel to avoid a conflict of interest in the pursuit of post-dismissal remedies when the initial federal petition was time-barred.  Finally, citing to Fourth Circuit precedent, Jones argues that Jack Strickland was ineffective as state habeas counsel and that *Martinez/Trevino* would have no meaning if claims could not be raised after the statute of limitations has run. (Doc. 149, p. 33-43.)

Respondent also contends that the new claims are procedurally barred due to a failure to exhaust in state court and are merit-less.  (Doc. 146, p. 23, 48.)  Jones replies that *Martinez/Trevino* excuses any procedural default based on a failure to exhaust because Jack Strickland was ineffective as state habeas counsel. Jones asserts that he has shown deficient performance under *Strickland* by pointing to red flags in the record that placed trial counsel and state habeas counsel on notice that more investigation needed to be done.  He states that he has attempted to show prejudice but, to the extent he has not carried his burden to show prejudice, it is because this Court denied him the time and funding to do so.  For the same reason, he asserts that it is premature for the Court to address these claims against trial counsel on the merits. (Doc. 149, p. 43-44.)

As stated previously with respect to claim 1a, the Court may look past any limitations bar, as well as any procedural default,

when an asserted claim has no merit. *See Busby*, 359 F.3d at 720; *Barksdale*, 2009 WL 81124, at *3, n.4; *Russell*, 2003 WL 21750862, at *3, n.3; *see also* § 2254(b)(2). The Court therefore reviews these unexhausted claims *de novo* to determine whether they have merit. *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009) (recognizing that the AEDPA-mandated deference to state-court decisions does not apply when state court did not adjudicate claim on the merits). Based on the following review, the Court concludes that the claims have no merit and that the procedural-bar exception in *Martinez/Trevino* is unavailable because the claims are not "substantial." *See Martinez*, 132 S. Ct. at 1318.

## II. Facts relating to claims 2, 3 and 4

Jones was taken into custody on September 11, 1999. Rex Barnett was appointed as lead counsel on October 5. (1 CR 15.) A month later, an investigator, E.D. Loven, was appointed with an initial budget of $1,000. (1 CR 20.) Co-counsel Larry Moore was appointed on March 1, 2000. (1 CR 23.) In June of 2000, trial was set for February 12, 2001. (1 CR 28.) In August of 2000, counsel filed more than fifty pretrial motions, including a motion for evidence "relative to diminished mental capacity of the defendant" at the time of the alleged offense and at the time he made any statements, a motion for grand-jury transcripts, and a motion to discover punishment evidence including expressions of remorse by the defendant. (1 CR 43-106; 2 CR 1-208.) Also in August, Loven

was replaced by investigator Janie Brownlee, who had a budget of $2,500. (2 CR 157.)

Five months before trial, on September 8, 2000, counsel advised the trial court that he had reason to believe Jones was not competent to stand trial. The trial court ordered a competency examination by Dr. Ann Turbeville. (2 RR 5-6; 2 CR 209-10.) Dr. Turbeville examined Jones on September 16, 2000, and concluded, among other things, that he was competent. She provided a written report detailing Jones's learning disabilities, drug abuse, self-injuries, psychiatric hospitalization, fighting and truancy, dropping out of school, playing with fire when he was young, extreme alienation from his family, and feeling like he had two personalities. (2 CR 211.)

Four months before trial, defense expert Dr. Raymond Finn examined Jones for competency, intelligence, suggestibility, and psychopathy, and also administered the Rorschach Inkblot Test and the Violence Risk Assessment Test. (2 CR 236-37; 35 RR 113-17.)

On December 21, 2000, the prosecutor notified defense counsel that Jones had complained of hearing voices in his head. (2 CR 261.) On January 19, 2001, the prosecutor notified counsel of potentially mitigating information received from Jones's twin brother, Benjamin, including information that Jones had different personalities known as David and John, talked to himself, heard voices, severely injured himself, was not alone when he killed his

41

aunt, and that they had never had a good relationship with their mother, whom Ben described as a crack head who once beat Jones with a broom.  The prosecution provided additional potential *Brady* information from Blaine Holliman that Roosa was with Jones when he beat his aunt to death, that both men killed Peoples and Sanders, that Jones cried when he confessed to Holliman, that Jones talked to himself, and that Holliman believed Jones was "slow, not crazy." (2 CR 280-81.)

Two days before trial, on February 13, 2001, trial counsel retained another psychologist, Carol Wadsworth, to evaluate Jones. (Doc. 129-13).  Dr. Wadsworth diagnosed Jones with heroin and cocaine dependence, dysthymic disorder, reading disorder, border-line personality disorder, and antisocial personality disorder. She summarized his academic, emotional, and behavioral problems from childhood to present, including early substance abuse and minimal contact with treatment facilities.  She described Jones as impulsive and self-destructive.  (Doc. 129-13, p. 2-4.)

Trial began on February 15, 2001.  (29 RR.)  Testimony showed that, despite her meager monthly income, the victim occasionally made small loans to various people, including Jones.  (29 RR 30-32; SX 1.)  On September 10, 1999, Bryant told her sister, Mattie Long, that she had refused Jones's request for a loan earlier in the day. Long testified that Bryant had seemed uneasy about her conversation with Jones.  (29 RR 51-52.)  The next morning, neighbors discovered

Bryant deceased. (29 RR 95-96.) She had suffered defensive bruising to her wrists and arms, a 9" by 12" bruise on her upper back, a 9" by 6" bruise on her upper arm, a broken collar bone, a broken shoulder blade, two fractured ribs, lacerations and an abrasion over her left ear, and a crushed skull. (30 RR 113-138.) A bloody, broken baseball bat was recovered at the scene, with a Raggedy Ann doll oddly placed on top of it. (29 RR 104, 153.) Blood and brain matter covered the floor, furniture, and ceiling. (29 RR 147-49.) There was no sign of forced entry, and shoe impressions found in the dirt around the victim's carport had class characteristics consistent with the tread of Jones's shoes. (29 RR 138-39, 30 RR 49-50.)

Bryant's car was located a half-mile from her house. In the passenger seat was a canvas car cover, under which was found a step rug, the victim's purse and wallet, a Bible, and a square piece of cloth. (29 RR 119, 123, 204-07.) Fingerprints were lifted from the vehicle, the purse, and a pink receipt inside the purse, but the police were unable to determine who made them. (29 RR 208, 223-24.) Trial counsel elicited testimony from the State's crime lab technician that the wallet contained three tithing envelopes with $60 that were apparently overlooked by the perpetrator. (30 RR 87-90.) A DNA analyst testified that the victim's blood was on clothing belonging to Jones that had been seized from Freeman's home. (30 RR 192-93.)

43

Freeman testified that she gave Jones a ride to Bryant's neighborhood on the evening before the murder and he did not come home that night. (29 RR 270; 31 RR 66.) Tiffany Jones, an acquaintance, testified that she and Blaine Holliman had spent the evening with Jones snorting cocaine and smoking marijuana while they packaged cocaine for resale. (31 RR 68-71.) Tiffany testified that Holliman had fronted Jones some money for drugs, but Jones wanted more and Holliman refused. Jones asked Tiffany for a ride to his aunt's house. (31 RR 70-73.) At Jones's direction, Tiffany dropped him off some distance down the street from her house. Tiffany testified that, when Jones returned a couple hours later, he was sweaty, wide-eyed, and scared, with $30 cash that he used to buy more drugs from Holliman. (31 RR 74-79.)

The Gates statement was admitted. (SX 85; 31 RR 164.) Mattie Long also testified that Jones called her from jail after his arrest and apologized for killing her sister. (29 RR 55-56.)

The defense recalled Tiffany, who testified that she saw a white man who could have been Roosa walking down the street earlier in the evening, and that she did not see any blood on Jones's clothes when he returned from Bryant's house. (31 RR 102, 233-34.) Defense counsel also recalled Freeman, who testified that she spoke to Jones about what happened and that she is now afraid of Roosa. (31 RR 239-40.) Counsel presented testimony from a neighbor who had seen a white van parked at the victim's house between 2:45 and

44

3:15 a.m. on the night she died.  (32 RR 9-11.)  Finally, trial counsel elicited testimony that Roosa, a white man, had been doing yard work for the victim during the summer, and that Detective Gates thought this was suspicious.  (31 RR 198-99; 32 RR 22-31.)

In jury argument, the prosecutor theorized that Jones had killed his aunt because she decided not to let him take advantage of her anymore.  The prosecutor emphasized Jones's confessions to the police and to Mattie Long, as well as his actions on the night of the murder and the presence of the victim's blood on his clothing.  (33 RR 11-21.)  The State argued that the victim gave Jones money only to keep him from stealing and that Jones's behavior after finding the detective's card on his door was indicative of guilt. (33 RR 38-46.)

Trial counsel acknowledged that Jones was present at the time of the murder based on the blood evidence, but argued that the State did not bring the proof necessary to conclude beyond a reasonable doubt that he was the killer.  Counsel emphasized the State's failure to explain the presence of the white van, failure to identify a footprint in the driveway that did not match Jones's shoes, failure to exclude the victim and her sister from finger-prints on the car, even though they were the only two people allowed to drive it, failure to lift any prints from the house, failure to use a blood spatter expert, and failure to determine a time of death.  Counsel argued that the State's theory did not fit

45

the facts because Bryant had refused to give Jones money on previous occasions, Tiffany did not testify that Jones was acting surreptitiously but thought Jones wanted to go to Bryant's house to sleep, Tiffany had seen a man in the street earlier in the evening who looked like Roosa, and the victim's neighbor was concerned about Roosa's being at the victim's house.  Counsel also pointed out that the police failed to investigate the doll that was left at the scene and mini-blinds that were found on the hood of the victim's car.  Counsel argued that if the purpose of the murder was theft, it did not make sense that the victim still had $60 in her wallet.  Counsel argued that all these unanswered questions existed because the police stopped trying after they got a confession out of Jones. (33 RR 21-33.)

Trial counsel argued that Jones's confession was involuntary based on his drug use, youth, lack of sophistication and education, history of suicide and mental illness, and counsel complained that law enforcement failed to record the confession.  Counsel argued that the confession did not comport with the physical evidence. Finally, counsel concluded that there was no evidence Jones intended to rob his aunt because she had always given him money before.  (33 RR 33-39.)

At punishment, the State introduced evidence that Jones had been on juvenile probation for carrying a handgun and for assault-ing a teacher.  (33 RR 55-83.)  Jones's juvenile records, which

46

were in evidence, also showed a referral for arson and for assault. (SX 99, 100.)   The State introduced evidence of Jones's drug problems, his gang tattoos and gang membership, and testimony about his involvement in the Peoples/Sanders murders that the Court previously discussed. (33 RR 90-91; 34 RR 29-45, 52-58, 85-148.)

The defense witnesses at sentencing included Freeman and Keisha, who testified about Jones's dysfunctional, transient child-hood, childhood abuse, his severe drug addiction and self-injuring behavior, and his alternate personality, "James," who appeared when Jones was on drugs or in trouble.   Keisha specifically testified that, when Jones was seven and she was ten, her stepbrothers made her and Jones have sex while they watched.   The sexual abuse continued at the hands of an older brother, Michael.   Freeman and Keisha also testified that Jones was no longer active in a gang. (34 RR 208-09; 35 RR 6-34, 49-111.)   Freeman's son, called by the State, testified on cross-examination that he was close to Jones, who acted like a father to him.   He said Jones told him not to do drugs and never join a gang because once you join, you cannot get out.   (34 RR 62-64.)

Magistrate Judge Allan Butcher also testified for the defense. Jones appeared before Butcher in connection with the Bryant capital murder charge.   Butcher testified that Jones appeared to be remorseful and that his eyes filled with tears as soon as he told Jones what he was charged with.   (35 RR 38-41.)

Psychologist Raymond Finn testified for the defense that he has particular expertise in dealing with dissociative or multiple personality disorders.  He diagnosed Jones with a milder form of dissociative identity syndrome that consists of amnesia and deper- sonalization, which is a coping mechanism for dealing with the self-loathing that results from severe and repeated childhood trauma and sexual abuse.  Jones's drug abuse was a way of deadening himself emotionally.  Dr. Finn said "James" murdered Bryant and that Jones knew what "James" did but had no control over it.  Dr. Finn said that, with dissociative disorders, it is not unusual for the milder personality to be very remorseful and apologetic and that Jones was, in fact, tearful, upset, and very distressed about what James had done.  He said Bryant was the one person who had treated Jones decently, and Jones loved the victim "as much as he probably loved anybody in his life."  (35 RR 133-59.)

Dr. Finn described Jones's family life as very unstable, involving a good deal of abuse of most of the younger siblings. (35 RR 159, 221-22.)  He explained that when a chid's parents fail to provide positive guidance and actually hurt the child or allow the child to be hurt, the child learns a world view that life is dangerous, people are no good, and nobody can be trusted.  Dr. Finn testified that when Keisha reported the abuse to their mother, the mother basically said she was a liar and threw her out of the house.  Dr. Finn said a mother's disregard is in many ways worse

48

than the original abuse, and the child grows up believing they will not be treated fairly or protected by anybody.  (35 RR 160-61.)

Dr. Finn testified that Jones's likelihood of engaging in future violent acts if released into the community was moderate to low.  (35 RR 163-165.)  He believed that the risk of violence was lower, however, in a highly controlled prison environment where Jones would have less access to drugs and could take advantage of treatment programs.  Dr. Finn believed Jones could be managed in prison.  (35 RR 165-167.)

On rebuttal, the State offered testimony from four additional witnesses.  Jones's probation officer from 1994 testified that Jones had been an eighth grader doing ninth-grade work, was a star pupil with leadership qualities, and was charming and engaging.  He said Jones was selected to go to Georgia as a representative of his school, that Jones did not seem weak, meek, or mentally ill, and he never noticed "James."  (35 RR 229-43.)  A corrections officer in the jail testified that Jones refused to comply with a verbal command, swore at the officer, and told him, "You don't need to know my name."  (36 RR 5-11.)  A deputy sheriff testified that he arrested both Roosa and Jones at a gas station in June of 1999, and the men appeared to be friends.  (36 RR 25-29.)

Finally, Dr. J. Randall Price testified for the State that, in his opinion, Jones did not have any mental illness or dissociative disorder but had psychopathic personality disorder.  He testified

49

that he was in agreement with Dr. Turbeville on this point.  (36 RR 42-47, 58.)  Dr. Price said that Jones did not hesitate to talk about the sexual abuse he had experienced and did not appear to have been dramatically impacted by it, such that it would have led to a dissociative problem.  (36 RR 48-51.)  Dr. Price believed Jones was malingering about having two personalities because Jones's simplistic good/evil split is not consistent with what the experts know about identity problems.  He said that the fact that "James" manifested before the murder occurred could be explained by Jones's drug abuse or his desire to explain away other wrong acts.  Dr. Price said that, when mental illness truly leads to crime, rarely is a partner involved.  Furthermore, Dr. Price said that amnesia is one of the classic earmarks for dissociative identity disorder but there was no "lost time" apparent in the materials or in Jones's interview.  (36 RR 52-58.)

Dr. Price agreed that some of Jones's self-injuring behavior was suicidal because he was depressed and on a lot of drugs.  Other times, like when he was striking himself on the head or burning himself on the arm, could be attributed to attention-seeking or being under the influence of alcohol or other substances.  Dr. Price said that self-injury can also trigger endorphin production in the brain, which makes a person feel good.  Dr. Price did not think Jones's expressions of remorse were genuine.  (36 RR 59-71.)  He opined that, when it comes to predicting future violence,

50

instrumental violence, such as the robbery/murder in this case, is a more stable trait than reactive violence, which results from an emotional reaction. (36 RR 73-74.) He believed there was a significant probability that Jones would continue to commit criminal acts of violence. (36 RR 90-91.)

In addition to the foregoing summary of evidence in the record, Jones attached several exhibits to his amended petition.[10] They include a police report, medical records showing a 1998 admission into John Peter Smith Hospital for suicidal ideations and drug problems, a written report from Dr. Wadsworth, orders related to the appointment of investigators and experts, billing statements from counsel, and an invoice from Dr. Wadsworth. There is also an itemized billing statement from Investigator Brownlee and Jones's analysis of it, along with a "prospective witness interview list."

### III.  Law applicable to claims 2, 3, and 4

Jones's allegations concern the timing and extent of counsel's investigation into Jones's life history and mental health, including counsel's use of experts. Such claims of ineffective assistance are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under that well-known standard, a petitioner must first demonstrate that counsel's representation fell below an objective

---

[10] Some of these exhibits are in the record. The rest are considered under the Court's power to review the merits of an unexhausted claim under § 2254(b)(2) and under the Supreme Court's directive that procedurally defaulted claims may be excused under *Martinez* only if they have "some merit."

standard of reasonableness, considering all the circumstances. *Strickland*, 466 U.S. at 687-88. A petitioner must also demonstrate prejudice, meaning a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's unprofessional errors the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

## IV. Claim 2:  Analysis

In claim 2, Jones asserts that trial counsel's sentencing investigation was ineffective under *Wiggins v. Smith*, 539 U.S. 510 (2003). He complains generally that the investigation was done on the eve of trial, terminated prematurely, and underfunded.

The amount of time or money spent on an investigation is not a litmus test for deficient performance. Moreover, Jones's complaint that the investigation was done on the eve of trial and terminated prematurely is not supported in the record. Trial began February 15, 2001. Ten months before trial, counsel met with counsel for Roosa and spoke with Dr. Finn. Six to eight months before trial, counsel conducted legal research for their pretrial motions, conferred with each other several times, obtained a new investigator, and participated in the pretrial hearing. Mr. Moore began "work on locating defense witnesses" on September 27, 2000, five months before trial. About the same time, counsel received and reviewed the State's witness list. (Doc. 129-8.)

Investigator Brownlee's records show that between October 5 and December 12, 2000, she spoke with or tried to speak with Jones's mother, father, and girlfriend, Mattie Long; and the victim's neighbor, Mrs. Hill; and met or spoke with co-counsel Larry Moore five times.  From January 10 to February 16, 2001, Brownlee spoke with or attempted to speak with Jones's father, mother, grandmother, sister Keisha, brothers Ben and Mike, Mike's wife Brandi, Blaine Holliman, Tiffany Jones, Jason Jackson, Paula Freeman, Dr. Finn, Kim Moore, the neighbor who saw the white van ("Mr. Kissentaner"), and "Mrs. Briggs's brother."  During that time, Brownlee's records document at least fifteen conferences with counsel, telephone calls to testifying witnesses, the transportation of Ben and Keisha to Dr. Finn, and interviews or attempts to locate seven witnesses or people who are not identified by name.  (Doc. 129-10.)  Jones has also provided the Court with an undated "prospective witness interview list" containing the names of Tiffany, Blaine, Terri White and Judith Van Hoof (guardians ad litem in the juvenile cases), Donald Murphy (Jones's stepfather), Leeversia Jones (Jones's grandmother), Richard Bone and Mark Turner (teacher assault victims).  Attached to the list are notes regarding the conflicting stories of Jones and James regarding the night of the murder, Jones's three juvenile referrals (arson, assault on teacher, and unlawfully carrying a weapon), a referral to an alternative school for setting a girl's hair on fire, three self-

inflicted gunshot wounds, and Jones's attendance at Pathways Learning Center. (Doc. 129-11.)

In 2000, Brownlee's initial budget of $2,500 was certainly less than the funds expended today, but her hourly rate was only $35, her voucher exceeded the budget by $440, and there is no indication that she was held to the initial budget or would not have been paid more. As noted, co-counsel Moore also worked on locating witnesses. Trial counsel together logged 587.9 hours of out-of-court time. (Docs. 129-6, 129-8.) Mr. Moore was in frequent contact with Brownlee, and he documents at least twenty conferences with her before trial. (Doc. 129-8.)

Much of Jones's argument is based on the assumption that trial counsel is ineffective if his billing records and file documentation are not detailed enough to show that counsel conducted a "comprehensive inquiry into the client's life and background," which Jones contends is required under bar-association guidelines and *Wiggins*. (Doc. 129, p. 52-61.) But there are no strict rules for counsel's conduct beyond the general requirement of reasonableness. *See Pinholster*, 131 S. Ct. 1406-07. The deficiency prong of *Strickland* asks "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105. Even under the Court's *de-novo* review, the standard for judging counsel's representation is a most

54

deferential one. *Id.* The purpose of the effective-assistance guarantee is not to improve the quality of legal representation, but simply to ensure that defendants receive fair trials. *Strickland*, 466 U.S. at 689. Standards such as those promulgated by the American Bar Association are "only guides" to what is reasonable, not its definition. *Bobby v. Van Hook*, 558 U.S. 4, 8-9 (2009).

Moreover, the presumption is in counsel's favor. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland, 466 U.S. at 690*)). This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did. *Id.* at 1407. Therefore, Jones's suggestion that the absence of sufficiently detailed billing records demonstrates deficient performance is unavailing.

Jones also alleges that counsel overlooked "red flags" that indicated a need for further investigation. The asserted red flags are issues that were obviously investigated or known to counsel, but Jones asserts that counsel should have done "more." Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "Counsel has

55

a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  Strategic decisions made by counsel following a thorough investigation are virtually unchallengeable, while decisions made after a less-than-complete investigation are reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-91.

Jones fails, for the most part, to specify the people and information counsel overlooked, much less provide evidence of them. This alone is a basis to deny the claim.  *Koch,* 907 F.2d at 530 (holding that conclusory allegations are not sufficient to raise a constitutional issue). The Court will nevertheless examine the whole record to determine whether the red flags support Jones's conclusion that counsel unreasonably limited their investigation.

### A.   Pretrial Red Flags

Jones first contends that the reports of Dr. Turbeville and Dr. Wadsworth signified that further investigation was needed regarding (1) Jones's educational disabilities, including what was meant by "emotional disturbance" in his school records, how Jones's behaviors manifested on a daily basis, and the dates the behaviors first appeared; (2) what testing was administered by the school; (3) whether Jones had Attention Deficit Disorder ("ADD") and if so, whether he was medicated for it; (4) whether Jones's drug dependency was caused by childhood sexual abuse and other instances of

abuse and neglect; (5) whether Jones was genetically predisposed to drug and alcohol addiction; (6) a possible involuntary intoxication defense, using the expert opinion of an addiction specialist; (7) whether the prison could provide an adequate structured environment if Jones were given a life sentence; and (8) possible brain damage due to polysubstance abuse.  (Doc. 129, p. 61-70.)  Jones also contends that counsel had an obligation to request his own compe-tency expert, rather than rely on the trial court's expert, Dr. Turbeville, and he complains that Dr. Wadsworth evaluated Jones only two days before trial began.  (Doc. 129, p. 56.)

First, defense counsel did, in fact, hire their own competency expert.  Dr. Finn first evaluated Jones four months before trial. He administered the Georgia Court Competency Test and, like Dr. Turbeville before him, found Jones competent to stand trial. (35 RR 138, 142, 145.)

Furthermore, Jones's complaint that Dr. Wadsworth evaluated Jones only two days before trial, which implies that counsel received her report too late to investigate any further, overlooks Dr. Finn's participation in this case.  Although he did not provide a written report (which made his cross-examination more difficult for the State, 35 RR 168), the record reveals the breadth of Dr. Finn's contributions.  Counsel first contacted Dr. Finn in April of 2000, ten months before trial, and he conferred with Dr. Finn about ten times throughout the case, including concerning counsel's

57

preparation for the cross-examination of Dr. Price. (Doc. 129-8, p. 5-15.) In addition to the competency test, Dr. Finn administered the WAIS-III intelligence test, the Rorschach Inkblot test, the Gudjohnnson Interrogative Suggestibility Scale, the Hare Psychopathy Checklist, and the Violence Risk Appraisal Guide. (35 RR 138-49.) Dr. Finn testified that he was specifically looking for "any kind of emotional or psychological illnesses or problems that played any role at all in his actions." (35 RR 141-42.)

Relevant to Jones's first complaint about the deficiently investigated school records, counsel provided Dr. Finn voluminous school records from about age four up through the time that Jones dropped out of high school. (35 RR 123-24, 140, 169.) Dr. Finn testified that Jones had academic problems in grade school, attended special education classes for problems with language skills, received speech therapy for a stutter, and had behavior problems beginning in middle school. Jones was expelled from almost every school he attended after that. (35 RR 218-19.) Dr. Finn assessed Jones's IQ at 79 but acknowledged on cross-examination that Jones's IQ scores throughout his school career were higher. (35 RR 144-45, 170-72.)

It is apparent from counsel's billing activity that Dr. Finn also assisted trial counsel in preparing to cross-examine the State's expert, Dr. Price. (Doc. 129-8, p. 15.) Counsel elicited testimony from Dr. Price that people with dissociative disorders

58

are likely to have problems with behavior, conduct, and school per-
formance, that Jones was in special education until about eighth
grade due to a speech impediment and learning disability, and that
Jones was eventually placed in a self-contained classroom. (36 RR
123-25.)

In addition to the foregoing, the report of Dr. Wadsworth
describes Jones's being held back in elementary school, special
education classes, varying grades, problematic classroom behavior,
impulsivity, attention-seeking behavior, short attention span, low
tolerance for frustration, disruptive behavior, assault, truancy,
tardiness, and dropping out. (Doc. 129-13, p. 3.)  There is no
question that defense counsel were aware of Jones's difficulties in
school.

Jones contends, however, that counsel should have interviewed
teachers and administrators regarding Jones's emotional distur-
bance, his early behaviors, testing administered by the school,
whether Jones had ADD, and school referrals to the Parents Guidance
Center and the YMCA. (Doc. 129, p. 62.)  According to Dr.
Wadsworth, the school records showed that Jones was evaluated for
emotional disturbance in fourth grade. (Doc. 129-13, p. 3.)
Although Dr. Wadsworth does not state the test results, the fact
that she does not report a diagnosis of emotional disturbance
suggests that the tests ruled it out.  In fact, Dr. Price testi-
fied, based on the school records, that emotional disturbance **was**

ruled out.  (36 RR 78-79.)  Similarly, Dr. Wadsworth reported that ADD was suspected and that Jones's parents were asked to have him evaluated.  There is no indication in any record before this Court indicating, and Jones does not suggest, that he was ever diagnosed with ADD.[11]  Likewise, there is no suggestion that the school referrals were related to something distinct and unknown to counsel.

In short, counsel possessed a significant body of information about Jones's education, as well as significantly more valuable mitigating evidence of childhood abuse, deprivation, and mental illness that formed the basis of counsel's defensive strategy.  A competent attorney could elect a strategy that did not include running down additional minutiae about Jones's behavior in school, emotional disturbance, possible ADD, and parent referrals.  *See Richter*, 562 U.S. at 89 (holding that counsel is entitled to "balance limited resources in accord with effective trial tactics and strategies").  The asserted red flags in Jones's school records do not suggest a deficient investigation by counsel.

Next, Jones contends counsel should have investigated a corre-lation between Jones's drug dependence and possible long-term changes to Jones's brain caused by childhood sexual abuse and neglect.  He asserts that counsel never explored or obtained expert

---

[11] The record indicates that Jones's mother was present in the courtroom, supporting him during the trial.  (35 RR 85.)

witness testimony to explain to the jury the significance of adverse childhood experiences, including especially the link between the childhood sexual molestation, (among many other instances of abuse and neglect), and Petitioner's escalating drug dependence and addiction. (Doc. 129, p. 63.) This claim is contradicted by the record. The connection between Jones's difficult childhood and his drug abuse was a major theme for the defense. (36 RR 174.) Keisha described the childhood abuse and neglect. (35 RR 51-69, 108-10.) Dr. Finn testified that Jones developed amnesia and depersonalization disorder as coping response to severe and repeated childhood abuse and that Jones turned to drugs as a way of medicating himself and deadening himself emotionally. (35 RR 150-52.) Jones fails to acknowledge this strategy or testimony. He therefore fails to argue or show that counsel's choice of experts on this issue was professionally unreasonable. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (holding that the selection of an expert witness is the para-digmatic example of the type of strategic choice that, when made after a thorough investigation of the law and facts, is virtually unchallengeable). Although Jones relies on a scientific article from 2006 concerning long-term changes in the brain caused by childhood trauma, counsel cannot be deficient for failing to pursue the science discussed in an article that did not yet exist. *See generally Maryland v. Kulbicki*, 136 S. Ct. 2, 4 (2015) (per curiam)

61

(holding that trial attorneys were not ineffective for failing to find report that presaged future developments in forensic science for lead-bullet analysis).

Jones next asserts that counsel should have investigated whether Jones was genetically predisposed to drug and alcohol addiction and should have used an addiction specialist to testify that Jones's addiction was "involuntary." Jones asserts that "counsel did no investigation into alcohol and substance abuse." (Doc. 129, p. 64.) Again, this is contradicted by the record. Keisha and Freeman described Jones's early and severe drug abuse for which they had both independently helped him seek treatment. (34 RR 208-09; 35 RR 6-8, 27-29, 69-70, 75, 78.) Keisha testified that she was once on drugs "real bad" and that their mother was on crack for most of their lives. (35 RR 52, 77.) Dr. Finn attributed Jones's "long history of drug abuse" to his childhood circumstances and mental illness. (35 RR 152.) And counsel retained Dr. Wadsworth specifically for an "evaluation of [Jones's] substance abuse history to assist with legal proceedings." (Doc. 129-13, p. 2.) Counsel knew from Dr. Wadsworth that Jones's brother abused alcohol and drugs, his father abused alcohol, and his mother used crack cocaine. (Doc. 129-13, p. 3.) Counsel designated Wadsworth as a testifying witness, but then made a strategic decision not to call her based on their evaluation of the

testimony of Dr. Finn and Dr. Price.  (Doc. 129-7, p. 2; doc. 129-6, p. 8.)

Counsel's choice of experts, made after a thorough investigation of the law and facts, is virtually unchallengeable. *Hinton*, 134 S. Ct. at 1089.  This Court is not required to examine the relative qualifications of the experts hired and called by trial counsel against the experts that might have been hired.  *Id.* In this regard, Jones does not state what an addiction specialist would have testified about, but instead refers the Court to four internet articles discussing addiction.  (Doc. 129, p. 64, n.7.) The Court has attempted to review the articles, but the link to one article does not work.  The other three are dated in 2014 or 2015. The Court cannot conclude that these articles, which discuss the physical science of addiction and recovery, were available to counsel in 2001.  As such, they cannot support the claim of ineffectiveness.  Jones does not show that counsel's failure to hire an addiction specialist was professionally unreasonable.

Jones relatedly complains, based on Dr. Turbeville's report, that counsel did not conduct a sufficient investigation to support an informed decision about an involuntary-intoxication defense and did not attempt to locate treating physicians and agencies regarding Jones's self-inflicted gunshot wounds and drug dependence. (Doc. 129, p. 67.)  The trial record is replete with testimony about Jones's drug abuse, his sister's drug abuse, his mother's

drug abuse, his self-injuring behavior, and three self-inflicted gunshot wounds. Counsel offered sixty-seven pages of psychiatric records from John Peter Smith Hospital, which were admitted into evidence and show that Jones shot himself in the chest in 1996 and shot himself in the hand and leg on two prior occasions. They include progress notes and personal information about Jones's living situation. They show a diagnosis of depression, adjustment disorder with mixed disturbance of emotions and conduct, cannabis abuse, history of polysubstance abuse, and stuttering. The diagnosis also notes "low finances" and a brother (Ben) "presently incarcerated." (35 RR 141; DX 15.) The hospital records attached to Jones's petition, which do not appear in the trial record, reflect a voluntary hospital admission for drug dependence on March 27, 1998. But he was discharged the same day and referred to an inpatient substance abuse program, which Freeman did testify about at trial. (34 RR 208-09; 35 RR 5-7); (doc. 129-12, p. 16, 19-21.) In light of this record, Jones's asserted red flag in Dr. Turbeville's report does not demonstrate a deficient investigation into Jones's treating physicians and agencies.

Moreover, to the extent this particular complaint relies on counsels' having overlooked an involuntary-intoxication defense based on the involuntary nature of addiction, he provides no legal authority for this defense. On the contrary, Texas does not appear to recognize such a defense. *Heard v. State*, 887 S.W.2d 94 (Tex.

64

App.--Texarkana 1994, pet. ref'd) (citing *Torres v. State*, 585 S.W.2d 746 (Tex. Crim. App. [Panel Op.] 1979, and rejecting argument that, to an alcoholic, drinking is not voluntary); *see Hernandez v. Johnson*, 213 F.3d 243, 250 (5th Cir. 2000) (noting that Texas courts have consistently ruled that alcoholism may not be the basis for an involuntary intoxication defense). Jones fails to demonstrate that counsel was ineffective for failing to investigate an involuntary intoxication defense.

Jones next asserts that counsel was ineffective for failing to investigate whether the prison could provide an adequate structured environment if Jones were given a life sentence. In fact, Dr. Finn administered a violence risk assessment to Jones and testified that Jones could be managed in prison and would become less violent as he aged. (35 RR 166-67.) Trial counsel also elicited testimony from Jones's juvenile probation officer that Jones did well in a structured environment and eventually completed his probations successfully. (35 RR 240, 244-45; 36 RR 124.) Even the State's expert agreed, at least on cross-examination,[12] that Jones could be managed in a confined setting like prison. (36 RR 150-51.)

Jones does not specify what more counsel should have done. The Court is aware that capital-defense counsel sometimes present

---

[12] Dr. Price subsequently agreed with the prosecutor on re-direct examination that, given enough resources, anybody can be managed, but he did not think the prison had the resources to prevent Jones from "ever" committing another act of violence. (36 RR 153.)

expert testimony about prison classification and security systems in order to demonstrate that the prison can prevent the defendant from committing further violence.   The Court is also aware, however, that such expert testimony can be diminished on rebuttal by detailed descriptions of all the violence that has occurred in prison despite the measures in place to prevent it.  *E.g., Rayford v. Thaler*, No. 3:06-CR-978-B-BD, 2011 WL 7102282, *10-11 (N.D. Tex. July 12, 2011) (not designated for publication) (rejecting argument that statistics on prison violence violated due process); *Ramey v. State*, No. AP-75678, 2009 WL 335276, at *14 (Tex. Crim. App. Feb. 11, 2009) (upholding admission of testimony graphically describing incidents of prison violence); *Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008) (holding that trial court properly allowed testimony about the violence that can occur within Texas prison system).  Jones fails to demonstrate any deficiency in counsel's chosen strategy, which avoided an exploration of prison violence before the jury.  The asserted red flag regarding prison's structured environment does not allege or show a deficient investigation under these facts.

Jones next contends his counsel failed to investigate possible drug-induced brain damage, based on the discrepancy between Jones's "low average" intellectual functioning at the time of trial and his largely "average" IQ scores as a juvenile.  As previously noted, Dr. Turbeville issued a report about five months before trial

began.  Dr. Finn conducted an evaluation about four months before trial.  Dr. Wadsworth completed her evaluation two days before opening statements.   There is no indication that any of these mental-health experts suspected brain damage or recommended neuro-logical testing.   Jones's present allegation of possible brain damage, which conflicts with the expert opinions at trial, is insufficient to allege or prove deficient investigation.   Trial counsel is not deficient for not canvassing the field to find more favorable experts on the issue of brain damage.  *See Storey v. Stephens*, 606 Fed. App'x 192, 196 (5th Cir. 2015).

B. <u>Guilt-Phase Red Flags</u>

Jones contends that the trial testimony of Mattie Long raised red flags (1) identifying twenty-four persons in Jones's extended family who had not been interviewed and (2) suggesting that Jones was raised in a dangerous neighborhood.  The record indicates that counsel's investigator contacted Mattie Long before trial, but Long chose not to speak with her.  (29 RR 57.)  As such, counsel cannot be faulted for failing to investigate any information known to Long.  Furthermore, Jones does not name the twenty-four allegedly overlooked family members.  (Doc. 129, p. 70.)  A petitioner who complains about an uncalled witness must demonstrate that the wit-ness was available to testify and would have testified, and that the proposed testimony would have been favorable to the defense.

67

See *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Jones does not satisfy this burden.

Jones also contends there were red flags that Jones suffered from an extensive "involuntary" drug problem long before the age of majority and could have suffered from split personality after being sexually molested, which caused Jones to inflict significant bodily injury on himself as "James." (Doc. 129, p. 70-71.) He contends that, with unspecified "further investigation" of Jones's psycho-social history, the defense could have challenged the *mens-rea* element of the capital-murder charge.

Of course, trial counsel presented expert testimony that Jones had a form of dissociative personality disorder that began in early childhood as a result of severe and repeated childhood physical and sexual abuse that led to an extensive drug problem. (35 RR 150-52.) Through the testimony of Dr. Finn, Freeman, and Keisha, the jury knew that Jones had shot himself, burned himself, hit his head on the wall, called himself names, placed a coat hanger around his neck, and hit himself in the head with an iron, a 40-ounce bottle, and a full can of laundry starch. (35 RR 19-21, 28, 71-73.) Jones fails to explain what additional evidence could have been overlooked on these matters or theorize how counsel should have used it to negate the *mens rea*. *See, e.g. Ruffin v. State*, 270 S.W.3d 586, 594 (Tex. Crim. App. 2008) (explaining how mental disease or defect could be relevant to rebutting *mens rea* for

68

murder).  The *mens rea* alleged in this case was an intentional -
killing.  (1 CR 3; 3 CR 393.)  Bryant's extensive injuries strongly
support the jury's finding that the killing was intentional, even
if it was committed while Jones was on drugs or acting as "James."
Because Jones fails to present a hypothesis under which a jury
could have acquitted him of capital murder for lacking the
necessary *mens rea,* his red flag does not allege or show a
deficient investigation.

### C. Punishment-Phase Red Flags

Jones contends that, although trial counsel presented
"isolated facts in mitigation" such as remorse and childhood abuse,
trial counsel did not provide a "cohesive story" of Jones's life to
explain why he was "less morally culpable and not worthy of a death
sentence, than someone who did not share his disadvantaged back-
ground and suffer from his various mental impairments."  Jones also
specifically complains there was no effort to explain the role of
James in the killing of Jones's aunt.  (Doc. 129, p. 72.)

The Court disagrees that trial counsel did not present a
cohesive story of Jones's life.  In closing argument, trial counsel
emphasized the divorce of Jones's parents, a transient home life,
poverty, and lack of security.  Counsel said Jones went to school
with an embarrassing stutter and, when he came home, he had no one
to talk to about it but was instead sexually abused.  Counsel
stated that Jones's older brother continued to abuse Jones and

69

Keisha even after they moved.  Counsel pointed out that the family situation was so bad that Ben ended up in juvenile detention and Keisha became pregnant at fourteen so she could move out.  At this point, Jones turned to drugs to make everything "go away," and he became addicted.  While the prosecution had downplayed the effect of Jones's childhood on his criminal choices, trial counsel challenged the jurors to think about whether they would trade their childhood for his.  Counsel argued that "James" developed as a survival mechanism to protect him after Ben was locked up.  Counsel reminded the jury that Jones shot himself three times, called himself names, and injured himself until people had to restrain him.  Counsel argued that Jones had never been a vicious person until Roosa, his supervisor at work, showed him new drugs.  Counsel emphasized that, despite this upbringing, Jones found something good with Freeman and tried to teach Freeman's sons about the mistakes he had made.  Counsel reminded the jury that, while the mental-health experts disagreed about Jones's diagnosis, they agreed that whatever was wrong with him was not a conscious decision on his part and that even sociopaths do not choose to be that way.  Counsel asserted that, while Jones is responsible for what he did, Jones did not chose his path.  Counsel argued that mental illness, not drugs and a desire for money, caused Jones's conduct, because being high and wanting more drugs was a scenario that had happened a thousand times before in Jones's life.  Counsel

asked the jury to remember Keisha and "the rage that's in that girl, the pain that's in her," because she suffered too and nobody pulled her and Jones out of it. Counsel pointed out that the State could not present one witness to dispute the truth of Jones's abusive childhood. Counsel noted that even Dr. Price believed Jones had been sexually abused and had mental problems long before the crimes were committed. Counsel asked the jury to think about why Jones "is sitting where he is" before making their verdict. (36 RR 172-90.)

In light of the foregoing, the Court rejects Jones's argument that counsel did not present a cohesive life story. Counsel made a comprehensive argument based on the evidence of how Jones came to be on trial for capital murder, beginning with an unstable and abusive childhood that led to drug abuse and mental illness.

Jones also contends that trial counsel did not explain the role of "James" in the killing of Bryant. Dr. Finn explained, however, that Jones is mild-mannered and passive while James is angry, suspicious, and prone to violence. (35 RR 153-54.) Dr. Finn testified that James was activated for some reason, partly because Jones was on drugs, and Jones was either not aware of the killing or was helpless to stop it. (35 RR 156-57.) Dr. Finn believed this was true because Bryant was the one person in Jones's life who showed him kindness and concern, and Jones loved Bryant as much as he probably loved anybody. Also, counsel presented

71

evidence that Jones was very remorseful and apologetic every time he discussed the murder and had gaps in his recollection of it. (35 RR 158-59, 185-87; 36 RR 148-49.)   To the extent Jones now complains that Dr. Finn did not more specifically state what triggered the appearance of "James," such evidence would not have furthered the chosen defense.   As discussed during trial, amnesia is part of dissociative mental illness, and Dr. Finn believed James's personality was the murderer because Jones did not remember parts of it.   A detailed explanation of what triggered James to appear could have conflicted with this defense by suggesting that Jones did not, in fact, have amnesia.   Jones fails to show that counsel's overall strategy incorporating evidence of Jones's childhood and mental illness was professionally unreasonable.

There are countless ways to provide effective assistance. Jones simply alleges in the abstract that counsel could have done more or takes issue with counsel's strategic choices.   His "red flags" provide nothing more than what is already in the trial record.   He has not overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) (recognizing that conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious

72

unfairness); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) (holding that arguments about whether counsel investigated enough or presented enough mitigating evidence come down to a matter of degrees and are even less susceptible to judicial second-guessing).

## D. <u>Prejudice</u>

Jones must also demonstrate that there is a reasonable probability that he was prejudiced by counsel's alleged deficiencies. *See Strickland*, 466 U.S. at 694. A "reasonable probability" of prejudice requires a substantial, not just a conceivable, likelihood of a different outcome. *Pinholster*, 131 S. Ct. at 1403. For claims that challenge counsel's sentencing investigation, the reviewing court reweighs the evidence in aggravation against the totality of available mitigating evidence and determines whether there is a probability--a probability sufficient to undermine confidence in the outcome--that the jury would have assessed a life sentence. *See Wiggins*, 539 U.S. at 534.

Jones first contends that a reasonable investigation would have revealed additional adverse childhood experiences, including his sister's mental illness, alcohol abuse on his father's side, and a drug and gambling addiction of the mother, that would have shown that his own drug addiction was not a volitional choice. (Doc. 129, p. 73-74.) The Court does not agree that the lack of additional testimony of this sort undermines confidence in the

verdict.   The jury received a substantial amount of information about Jones's childhood.   They heard about Jones's abandonment by his biological father, his mother's addiction to crack and gambling, his mother's shooting at him with a gun, the children's being locked in the house when their mother went out, Keisha's drug use and early pregnancies, gang involvement by Jones and his twin Ben, Ben's juvenile detention, Jones's being raised by an aunt and grandparents, the separation of the siblings, Jones's stuttering, his learning disabilities, his attempted suicide and two other self-inflicted gunshot wounds, his frequent changes in residences and schools, his school expulsion, and sexual abuse.   (35 RR 51-54, 69, 77, 84, 88-90, 107-110, 150-51, 188, 197, 208, 212, 217-21.) The jury knew Jones began using drugs at the early age of thirteen, used $50 to $300 worth of drugs a day, and attended drug rehabilitation in 1998 and 1999 without success.   (34 RR 208-09; 35 RR 5-6, 70, 78-79).   The evidence showed he used heroin, cocaine, crack, and marijuana and that his gang associates did not want him around because of the heroin use.   (35 RR 10, 197-98.)   The jury received testimony that Jones had another personality who hurt Jones and called him names, and it received records related to a psychiatric hospital admission in 1996 for shooting himself in the chest and for depression.   (35 RR 19-25, 71-74, 106, 153-55; DX 15.)

The jury heard evidence elicited by both sides connecting Jones's drug addiction to his abusive childhood and mental illness.

(35 RR 150-52.)  The theory that Jones was shaped by his adverse childhood was not seriously disputed by the State.[13]  The State's expert in fact agreed that childhood sexual abuse occurred, that parental neglect and childhood abuse negatively affect one's behavior and judgment, and that a mental disorder such as Jones's increases the probability of substance abuse.  (36 RR 111-12, 132-33, 135-38.)  Keisha testified that she and her mother also used crack, which reasonably suggested a biological or family component to Jones's addiction.  (35 RR 52-53, 77, 84.)  Dr. Finn testified on cross-examination about Jones's drug dependency, that is, having to take drugs to avoid withdrawal, rather than simply to get high.  (35 RR 196.)

Jones's lack of volitional choice caused by a dysfunctional childhood that led to mental illness and addiction was the major theme for the defense.  (36 RR 173-76, 181.)  Counsel summarized that it would have been better for Jones if he "had been raised by wolves . . . because at least wolves are social animals."  (36 RR 177.)  The prosecutor argued simply that it was not an excuse and that, at some point, we know the difference between right and wrong and "regardless of our upbringing or the lack thereof, we make a choice."  (36 RR 170-71, 195-96.)  Given the evidence and theories argued by both sides, Jones's assertion that the trial outcome

_____

[13] During cross-examination of Keisha, the prosecutor mitigated some of the negative testimony about their mother and aunts and the sexual activity between Keisha and Jones.  (35 RR 85-88, 103-04.)

would have been changed by even more evidence of his dysfunctional upbringing is unrealistic.

Jones next asserts that further investigation would have shown that Jones has brain damage from prolonged alcohol and drug abuse. Except for one low-average IQ score of 79, achieved during his preparation for trial, Jones provides no support for the contention that he has brain damage. Certainly, a defendant awaiting trial for capital murder may achieve lower IQ scores for any number of reasons besides brain damage. Even assuming that Jones could now present the opinion of an expert who believes that he has brain damage, it would merely contradict the State's expert. Dueling expert opinions do not establish a "substantial likelihood" of a different trial outcome, as required for prejudice under *Strickland*.

Moreover, assuming Jones's has brain damage from his prolonged alcohol and drug abuse, the Court does not view low-average intelligence as a significantly mitigating circumstance. *Cf. Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (holding that IQ of 67 is inherently mitigating); *Atkins v. Virginia,* 536 U.S. 304, 318-19 (2002) (explaining why mental retardation diminishes personal culpability). There is no suggestion in this record that Jones has subaverage intelligence or is intellectually disabled. On the contrary, Dr. Finn testified unequivocally that Jones is not mentally challenged. (35 RR 172.) Dr. Turbeville stated he

appeared to be of low-average intelligence. (2 CR 212.) Dr. Price estimated his IQ to be average, based on the scores in his school records. (36 RR 39.) In addition, a defensive theory that emphasized low intelligence and brain damage would have conflicted with, and is no better than, the chosen defensive strategy that Jones had a dissociative disorder. Dr. Finn testified that the higher his actual IQ, the more Jones would fit the profile of a person with dissociative disorder. (35 RR 172-73, 209.) For all these reasons, Jones's assertion that counsel overlooked brain damaged based on a pre-trial IQ score of 79 does not undermine confidence in the jury's verdict, as required for *Strickland* prejudice.

Jones also contends that further investigation would have provided evidence that Jones would not be a future danger in a structured prison environment. Counsel enacted a reasonable strategy on this issue by presenting testimony, including testimony from two State's witnesses, that Jones could be managed in prison and previously did well in the structured, probation environment. (35 RR 167, 234, 245; 36 RR 124, 150-51.) Jones fails to show what more counsel could have done and therefore fails to demonstrate that counsel's chosen strategy on this issue undermines confidence in the verdict.

Jones alleges that further investigation into Keisha's mental illness would have "cast further light" on the Jones family's

history of mental illness, neutralizing Dr. Price's testimony that Jones was merely a psychopath and a drug addict.  The record indicates that Keisha was admitted to Charter Hospital for suicidal tendencies and to get away from her older brother's sexual abuse. (Doc. 129-13, p. 3); (35 RR 56.)  Jones presents no factual support for his suggestion that another family member was diagnosed with dissociative disorder.  He presents no factual support that dissociative order is genetic.

Assuming there is a genetic component to his dissociative disorder, however, Jones fails to demonstrate that it would have been any more effective with the jury than the theory counsel presented--that his disorder was caused by severe and repeated childhood abuse.  This is in part because trial counsel's cross-examination of Dr. Price met or exceeded reasonable professional standards.  Co-counsel Moore conferred with Dr. Price before he testified, received material from Dr. Price, and apparently spoke with Dr. Finn to help prepare for Dr. Price's cross-examination. (Doc. 129-8, p. 15.)  Under Moore's cross-examination, Dr. Price agreed that Jones was forthright and truthful during the interview, that Jones was in fact sexually abused as a child, that Jones had episodes of self-mutilation, and that "James" manifested prior to the offense for which Jones was on trial.  (36 RR 107-08, 111-14.) Dr. Price admitted under Mr. Moore's cross-examination that scoring for the psychopathy checklist is in good part subjective.  Price

agreed that, with any mental disorder or psychopathy, there is an increased probability of substance abuse because the person is trying to medicate himself. (36 RR 116, 119-20, 134.) Dr. Price testified about the effects of Jones's history of parental neglect and child abuse. He agreed it could lead to behavior problems and affect a person's judgment of what is right and wrong. When asked what causes psychopathy, Dr. Price testified that the current thinking is that "a person has a [biological] tendency and then lack of early attachments to others, lack of early . . . bonding experiences with others has been investigated and found to be more common in the childhoods of psychopaths." He clarified, "this is not something that, you know, at the age of 12 that some kid decides they want to grow up and be. It's – their life leads them to it." (36 RR 135-38.) Dr. Price agreed that Jones shot himself in the chest in a serious suicide attempt and not just because Jones was abusing drugs. (36 RR 142.) Dr. Price agreed there was evidence of Jones's remorse. Counsel also established that, unlike Dr. Finn, Dr. Price did not speak to Jones's family members and did not know that Jones had apologized in a phone call and letter to Mattie Long. (36 RR 143-46.) Under counsel's cross-examination, Dr. Price read the jail interview notes to the jury, which indicated that Jones was tearful and said he is turning into "James," that "James" hurts him, and that he did not mean to kill anybody. (36 RR 147-49.) Trial counsel also pointed out that Dr.

Price probably misinterpreted a jail infraction in which Jones had demanded some "rank." (36 RR 121.)   Finally, under counsel's questioning, Dr. Price admitted Jones could be manageable in prison. (36 RR 150-51.)

Counsel's effective cross-examination allowed counsel to argue extensively to the jury that Jones was mentally ill, not a sociopath but that, whatever was wrong with Jones, the experts agreed that it was not a conscious decision on his part. (36 RR 180, 183-89.)   Given the concessions from Dr. Price and the arguments asserted to the jury, evidence of a family history of mental illness would add little additional support to the defense, and its absence does not undermine confidence in the verdict.

Jones next argues that further investigation would have shown that Jones's drug use and gang membership was a product of the dangerous neighborhood in which he grew up. (Doc. 129, p. 76.) Jones fails to present evidence that his drug use and gang membership is attributable to the character of his neighborhood. He presents a newspaper article about life in the Riverside area of Fort Worth in the 1980s, but its relevance is unclear.   Jones points to evidence that the *victim's* neighborhood was dangerous, but the record indicates that Jones grew up with a grandmother or the victim's sister, Mattie Long, not the victim.   And he does not connect any of these addresses to the "Riverside area." (35 RR 52, 86-88; SPX 2.)

80

Assuming for the sake of argument that Jones grew up in a bad neighborhood, counsel's chosen strategy of explaining Jones's drug addiction as a product of his childhood abuse and mental illness is improved little, if at all, by that fact.   Trial counsel also employed a reasonable strategy for dealing with the gang evidence. Freeman and Keisha testified that Jones was no good at being in a gang because he could not hurt anybody, that his membership was inactive, and that he joined a gang to get a reputation so he would not have to fight.   Dr. Finn learned from Ben that Ben quickly surpassed Jones in terms of gang hierarchy, and Jones left the gang after a year because his heroin use made the other gang members avoid him.   Freeman's son also testified that Jones told him to never join a gang because one cannot get out.   (34 RR 63; 35 RR 29, 76, 80, 197-98.)   Growing up in a bad neighborhood, assuming it is true, contributes little to lessening the aggravating impact of Jones's drug use and gang violence.   Counsel's failure to pursue such a theory does not undermine confidence in the verdict.

Finally, Jones asserts that Dr. Finn did not have the factual foundation needed for his evaluation and could not "tell the jury who Petitioner is, why Petitioner was so severely drug addicted, or explain what propelled Petitioner to commit the offense."   Jones states that, if the investigation had been sufficient, Dr. Price would not have been able to testify that Dr. Finn was mistaken because he "had not been given all the information that Dr. Price

had" been given. Jones contends counsel "did little to assist" both of his experts, and their evaluations were incomplete and unreliable. (Doc. 129, p. 77-78.)

Based on his cross-examination, the information Dr. Finn lacked referred to (1) Keisha's grand-jury testimony that she had never seen "James"; (2) information in Jones's juvenile probation records that others thought Jones was very likeable and a leader, and that people followed him eagerly; (3) a jail incident in April where Jones used abusive language and demanded some "rank"; and (4) a juvenile conviction for assaulting two teachers. (36 RR 61; 35 RR 189-90, 193-95, 203). This information was known to counsel and therefore not overlooked. (4 RR 11 (Keisha's grand jury testimony); 33 RR 77-83; 2 CR 217 (assault on teachers), 240 (April jail incident), 283 (juvenile probation records)).

Moreover, there is no evidence that Dr. Finn's opinion would have changed had he possessed the unknown information. At best, he conceded that Keisha's grand-jury testimony **could** under certain circumstances change his opinion. (35 RR 189, 193-96, 214-15.) But both experts in this case were subject to very thorough and effective cross-examination. In fact, as discussed earlier, counsel showed that *Dr. Price* lacked information because he did not talk to Jones's family members and did not know about Jones's contacts with Mattie Long. (36 RR 145-46.) Counsel also showed that Dr. Price had probably misinterpreted the April jail incident

as a demand for respect.  (36 RR 121.)  Overall, Jones does not support his conclusion that his experts lacked information that would have changed the outcome at both phases of trial.

Jones fails to demonstrate that counsel's alleged deficiencies, either individually or considered in their totality, demonstrate prejudice sufficient to undermine confidence in the verdict.  The Court denies claim 2.


## V.   Claim 3

In claim 3, Jones alleges counsel was ineffective for failing to develop condition-of-the-mind evidence that could have negated the *mens-rea* element and lessened Jones's moral culpability at punishment.  He argues that the frenzied and out-of-control character of the killing plus other red flags in the record suggested a need to further investigate Jones's mental health.  Counsel's selection of expert witnesses is the paradigmatic example of the type of strategic choice that, when made after a thorough investigation of the law and facts, is virtually unchallengeable.  *See Hinton*, 134 S. Ct. at 1089.  The Court will address the alleged red flags to determine if counsel's selection of experts amounted to deficient representation.

### A.  Alcohol Addiction and "Settled Insanity"

Jones first contends his counsel should have investigated further into his alcohol addiction, which would have supported a

settled-insanity defense. (Doc. 129, p. 81.) The Texas common law defense of settled insanity was otherwise known as "delirium tremens." *See Evers v. State*, 20 S.W. 744, 748 (Tex. Crim. App. 1892).[14] It did not survive the enactment of the Texas Penal Code. The CCA has unanimously held that the only affirmative defense available for those who commit crimes while suffering from an abnormal mental disease or defect is insanity under Texas Penal Code section 8.01. *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010); *see also Sprouse v. Thaler*, No. 3:10-CV-00317-P, 2013 WL 1285468, at *9 (N.D. Tex. Mar. 29, 2013), *aff'd sub nom. Sprouse v. Stephens*, 748 F.3d 609 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 477 (2014). Counsel was not ineffective for failing to investigate a defense that did not exist. *See Koch*, 907 F.2d at 527 (counsel is not required to make futile motions or objections).

Nevertheless, Jones contends that today's scientific litera-ture refers to settled insanity as frontal-lobe dysfunction, and he cites a scientific article and an internet website. This argument fails in several respects. Although Jones quotes from these

---

[14] In his Reply, Jones asserts that settled insanity is not a defense but a "straight up denial" of the *mens rea* element of the offense. (Doc. 149, p. 60.) He appears to confuse the discussion in *Evers* about **temporary** insanity caused by intoxication (which, at the time, could determine the degree of murder depending on how it affected *mens rea*) with the later discussion in *Evers* of *settled or fixed* insanity, which *Evers* clearly refers to as "a complete defense to crime." *Evers,* 20 S.W. at 748; *see also Thomas v. State*, 177 S.W.2d 777, 779 (Tex. Crim. App. 1944) (stating that a settled insanity produced by long-continued use of ardent spirits is a full defense.) In any event, the characterization of settled insanity as a defense or as the denial of *mens rea* does not affect the outcome of this case since, as discussed later, there is no factual support for it.

sources extensively, he does not provide authority that equates the former legal defense of settled insanity with the frontal-lobe damage discussed in the articles.  In addition, the articles do not appear to have been in existence when trial was conducted in February of 2001.  Thus, counsel could not be ineffective for failing to investigate their content as the modern-day version of settled insanity.  *See Kulbicki*, 2015 WL 5774453, at *2 (holding that counsel were not ineffective for failing to predict developments in forensic science).

The gist of the proffered sources is that alcohol abuse damages the frontal lobe and possibly weakens a person's ability to inhibit his behavior.  (Doc. 129, p. 83-84.)  Assuming this is true, the inability to inhibit one's behavior does not show a lack of criminal intent; it shows, at best, that a person does not have the ability to resist acting upon his criminal intent.  Such evidence is not a defense in Texas.  *See generally Ruffin*, 270 S.W.3d at 593 (holding that Texas does not recognize defenses that would permit the exoneration or mitigation of an offense because of a person's supposed psychiatric compulsion or an inability to engage in normal reflection or moral judgment).  Simply put, Jones offers no viable legal theory under which a jury could conclude that, at the time he beat the victim to death with a baseball bat, he did not intend the deadly consequences of that act.

Finally, assuming a settled-insanity defense (or the proffered modern version of it) had been available to Jones, it is caused by long-continued drunkenness and brought on by the "abstinence of drink." *Evers*, 20 S.W. at 748 (defining settled insanity as delirium tremens, "caused by the breaking down of the person's system by long-continued or habitual drunkenness, *and brought on by the abstinence of drink*") (emphasis added). But there is no indication in the record that Jones was suffering from the effects of alcohol withdrawal at the time of the murder. Jones merely points to testimony that Tiffany Jones did not recall Jones's drinking cognac while packaging drugs for sale in the hours before the murder. (31 RR 69, 84).

For all these reasons, Jones does not show that counsel was deficient in his investigation or use of evidence regarding Jones's alcohol abuse. Further, Jones fails to demonstrate, based on the alleged deficiency, that the result of the proceeding would have been different.

B. <u>Childhood trauma</u>

Jones alleges that counsel failed to sufficiently investigate Jones's childhood abuse and its potential to cause long-term changes in the brain, as explained in a scientific article from 2006. As stated previously, counsel cannot be ineffective for failing to investigate the contents of a scientific article that did not exist at the time of trial.

86

Jones hypothesizes that he was prejudiced because "such evidence of traumatic childhood abuse can be relevant and admissible . . . in the guilt/innocence phase to negate the *mens rea* element of capital murder when traumatic childhood events affect memory, learning, ability to regulate mood, and social development, and result in frontal lobe pathology." (Doc. 129, p. 84-85.)  Jones again fails to explain how, given the facts of this murder, such characteristics could show a lack of intent to kill, rather than simply psychiatric compulsion or an inability to engage in normal reflection or moral judgment.  Jones fails to demonstrate deficient representation or prejudice in counsel's investigation and use of childhood trauma evidence.

## C.   Polysubstance abuse

Jones alleges that counsel failed to sufficiently investigate his drug addiction.  He asserts that individuals with histories of childhood abuse are at greater risk for trying drugs as a means of reducing the emotional pain and for developing an addiction.  He further contends that addiction that occurs prior to the age of majority is admissible to negate the *mens rea* of capital murder "if it could be shown that his drug craving on the night of the offense increased his agitation, exaggerated his response to stimuli, reduced his threshold for anger, and thereby impaired the ability of [Jones] to govern his conduct."  (Doc. 129, p. 85-86.)

87

Jones fails to acknowledge that his counsel **did** present evidence of childhood abuse as the cause of Jones's mental disorder and drug abuse.  Dr. Finn testified that Jones developed dissociative disorder in early childhood as a result of "severe and repeated abuse, both physically and sexually," which developed even more in adolescence.  He testified that Jones used drugs to medicate himself and deaden himself emotionally.  (35 RR 150-52.)  To the extent Jones relies on the scientific theory that childhood trauma causes physical changes to the brain, the sources Jones relies upon are the same article referenced previously plus links to internet articles that are either not available or post-date the trial.  Counsel cannot be deficient for failing to investigate information that did not exist at the time of trial.

Jones also fails to assert or demonstrate prejudice because he provides no authority for his argument that drug addiction before the age of majority negates the *mens rea* of capital murder.  As with the two prior subclaims, his argument that drug cravings increased his agitation, exaggerated his response to stimuli, reduced his threshold for anger, and impaired his ability to govern his conduct would not show that he lacked intent to kill.  Such characteristics would actually support the State's theory of the offense by showing that drug addiction was Jones's motive for committing murder.  *E.g., Jackson v. State*, 160 S.W.3d 568, 572 (Tex. Crim. App. 2005) (holding that paranoia due to schizophrenia

does not negate intent to kill but provides motive for murder).
Jones fails to demonstrate a deficient investigation into his drug
addiction and fails to allege or prove prejudice.


D. Dissociative personality and antisocial disorder

In two lightly briefed subsections, Jones appears to contend
that counsel should have further investigated his dissociative
disorder and his life history to refute Dr. Price's testimony that
Jones was a psychopath. The complaint appears to be that counsel
overlooked a physiological basis for antisocial personality
disorder.[15] (Doc. 129, p. 86-87, 89.)

The experts for the defense and the State both administered
the same psychopathy checklist, but unlike Dr. Price, Dr. Finn did
not diagnose Jones with antisocial personality disorder. (36 RR
58, 61.) Offering a physiological explanation for antisocial
personality disorder would therefore have undermined the defense
expert or, at best, confused the jury, since the defense expert did
not make that diagnosis. Further, Jones appears to rely on a July
2001 article to support the notion that psychopathy is not a choice
but a product of frontal-lobe pathology. (Doc. 129, p. 89.) This
article did not exist in February of 2001 when the trial occurred.

---

[15] As do the parties, the Court uses the terms "antisocial personality,"
"psychopathic personality," "sociopathy," and "psychopathy" interchangeably, as
referring to a personality disorder characterized by a lack of conscience.

Counsel is not deficient for failing to pursue a scientific theory underlying a diagnosis that his expert did not make, and that was postulated in an article that did not yet exist.

Further, Jones cannot show prejudice. To the extent the State's expert opined that Jones was a psychopath, trial counsel elicited a concession from Dr. Price that psychopaths do not "wake up one day and decide" to be antisocial, but rather are a product of their life circumstances. (36 RR 138.) This concession accomplished the same end that Jones's frontal-lobe theory would have accomplished, namely, that psychopaths do not chose to be that way.

In any case, Jones provides no evidence that he actually suffers from a frontal-lobe pathology that might explain his violent behavior. And the article he relies upon discusses methodological flaws in its supporting data, one of which is that few studies adequately address concurrent causes of violent behavior, such as emotional stress, drug and alcohol misuse, physical and sexual abuse, family breakdown, and poverty. *See* M.C. Brower and B.H. Price, *Neuropsychiatry of Frontal Lobe Dysfunction in Violent and Criminal Behavior: A Critical Review*, 71 J. NEUROLOGY, NEUROSURGERY AND PSYCHIATRY 720 (July 2001). Significantly, all of these other potential causes of violence were present in Jones's life, which would greatly diminish the value of the article as an explanation for his crime.

Counsel presented a cohesive theory that Jones's childhood trauma and abuse led to dissociative disorder and drug addiction, which ultimately caused "James" to murder the victim.  Jones's childhood abuse and early drug and alcohol addiction were not seriously refuted by the State or its expert, a fact that counsel emphasized to the jury.  (36 RR 184.)  So, even assuming that counsel could have discovered and presented the scientific theory that childhood abuse and drug and alcohol addiction affect brain development as Jones suggests, it would add little additional support to the defense theory that Jones's behavior was not a product of volitional choice.  With respect to condition-of-mind evidence, Jones does not demonstrate deficient performance or prejudice sufficient to undermine confidence in the outcome.  The Court denies claim 3.


## VI.  Claim 4

In claim 4, Jones argues that counsel's inadequate life history investigation caused his experts to provide unreliable evaluations on sanity, competency to confess, competency to stand trial, and mental-health-based mitigation.  (Doc. 129, p. 91-93.)  Jones reasserts the deficiencies alleged in claim 2 regarding Brownlee's time and budget.  Jones then argues that, due to the financial and time constraints, Dr. Finn and Dr. Wadsworth had an inadequate life history, and Dr. Finn did not have all the information needed for

the Hare Psychopathy checklist and could not explain discrepancies in Jones's IQ scores.  (Doc. 129, p. 92-93.)

The Court has already addressed these alleged inadequacies. While Jones argues that counsel should have spent more time and money, these things do not demonstrate a deficient investigation. Counsel can always do "more."  *See Kitchens*, 190 F.3d at 703 (holding that arguments about whether counsel investigated enough or presented enough mitigating evidence come down to a matter of degrees and are even less susceptible to judicial second-guessing).

The Court has also addressed Jones's complaint about Dr. Finn's cross-examination.  The information that was unknown to Dr. Finn was known to counsel and would not have changed Dr. Finn's diagnosis.  Furthermore, the assertion that Dr. Finn was "unable to explain the discrepancies in the IQ scores" is not shown by the testimony that Jones cites.  In the exchange with the prosecutor, Dr. Finn was not asked to explain why Jones's pretrial IQ score was lower than his childhood scores.  (35 RR 170-71.)  The Court denies claim 4.

## VII. FUNDING

In his Reply, Jones argues that the Court's denial of his requested funding and a one-year continuance prevented him from carrying his burden to show "some merit" to his claims against trial counsel and state habeas counsel.  He contends this violates

92

18 U.S.C. § 3599, *McFarland v. Scott*, 512 U.S. 849 (1994), and *Martinez/Trevino*. (Doc. 149, p. 43-59.)

The Court vacated its dismissal order and reopened this case on February 6, 2014. (Doc. 113.) The Court ordered Jones to file an amended petition within ninety days. Jones requested the assistance of co-counsel to meet this deadline on the ground that Ms. Brandt's efforts during the preceding six years had been directed toward the equitable-tolling issue. In response, Michael Mowla was appointed a week later on February 13, 2014. (Doc. 114, 115.)

On March 23, Jones filed a motion for continuance, seeking a new due date that was one year from the date the case was reopened. The motion again argued that Ms. Brandt's appointment had been limited to litigating the issue of equitable tolling. The motion implied that Ms. Brandt had never had the opportunity to conduct a full investigation and records review. (Doc. 116.) On April 1, 2014, the Court granted the motion in part, allowing Jones six weeks, in addition to the original ninety days, to file amended briefing. (Doc. 118.) Jones moved for reconsideration, which the Court denied. (Docs. 119, 120.)

Twenty-eight days before the due date, Jones moved for leave to file a first application for funding to be heard *ex parte* and under seal, which the Court denied. (Docs. 121, 122, 123.) Twenty days before the due date, Jones publicly filed a motion seeking $30,000 to fund a 400-hour mitigation investigation. (Doc. 124.)

Jones again argued that it was Ms. Brandt's first opportunity to seek funding because she had been previously appointed for the sole purpose of litigating the equitable tolling issue. (Doc. 124, p. 5, 7.) One week before the due date, Jones filed a second motion for continuance, reasserting his request for a full year to file the amended petition. (Doc. 126.) The Court denied the request for funds because, among other things, Jones failed to demonstrate that $30,000 was reasonably necessary and failed to justify exceeding the $7,500 statutory limit. (Doc. 127.) The Court denied the second motion for continuance because Jones presented no authority that equitable tolling restored him to the position he was in at the conclusion of the state habeas proceedings, with another one-year limitations period. (Doc. 128.)

Jones contends the above orders violate 18 U.S.C. § 3599, *McFarland*, and *Martinez/Trevino.* Jones appears to have abandoned the argument that Ms. Brandt's appointment was limited to equitable tolling matters. (Doc. 149, p. 46.) Indeed, this argument had been flatly refuted by the order appointing Ms. Brandt, which authorized her to pursue "whatever legal avenues" were available to Jones in federal court. (Doc. 31.) It was also refuted by the fact that, in 2009, Ms. Brandt filed a reply to Respondent's answer to the original petition, a stay and abeyance to return to state court and exhaust new claims, a proposed eighty-four page amended petition, which raised claims of actual innocence, claims related

94

to the absence of mental impairment evidence at guilt, and an ineffective-assistance claim against trial counsel for failing to timely investigate, develop, and present in all phases of trial, crucial information about Jones's mental impairment and life history. (Docs. 55, 53, 57.)

Instead, Jones now contends, for the first time in this Court, that Ms. Brandt has had the opportunity to conduct only a "due diligence inquiry" rather than an "investigation" in this case. (Doc. 149, p. 49.)  This is so, he contends, because (1) he could not have obtained funding in federal court after the original petition was dismissed in 2007, (2) circuit precedent prior to *Martinez* precluded funding for claims that were unexhausted and procedurally defaulted, and (3) the Court denied his request for abeyance, so he could not have obtained funding in state court. (Doc. 149, p. 50-55.)  Jones makes no showing, however, that he ever asked for funding in these various stages of the litigation.

Jones filed his first and only funding motion after the Court granted equitable tolling and reopened the case.  (Doc. 124, "Opposed First Motion for Funding.")  In it, Jones claimed that, based on Ms. Brandt's "due diligence review,"[16] funding was needed to investigate a *Wiggins* claim against trial counsel that was

---

[16] According to the motion, counsel's due-diligence review included attempted interviews of Paula Freeman and Michael and Brandi Jones.  It also included requests for school records, medical records, incarceration records, and "numerous other documents," and attempts to locate Dr. Finn's files. (Doc. 124, p. 24-25.)

viable under *Martinez/Trevino*.    Jones asserts that the Court's denial of his request for funds effectively required him to prove his claim before funding it, and therefore conflicts with § 3599 and *McFarland*, under which the right to counsel (and funding) attach prior to the formal filing of a federal habeas petition.  He also contends the Court's ruling conflicts with *Martinez/Trevino* because it thwarts the investigation of claims against trial counsel that may satisfy the exception to procedural bar in *Martinez/Trevino*.

First, *Martinez* does not mandate pre-petition funding.  *See Crutsinger v. Stephens*, 576 Fed. App'x 422, 431 (5th Cir. 2014).  Second, Jones makes global arguments about the timing of and need for adequate funding of habeas petitions with which the Court does not necessarily disagree.  But Jones sought well in excess of the statutory maximum amount to fund a 400-hour mitigation investiga-tion, to be conducted in accordance with the 2008 American Bar Association Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases.  Even if the ABA Guidelines controlled ineffective assistance claims, which they do not, the 2008 Guidelines would not apply in this case because the trial was held in 2001. *Van Hook*, 558 U.S. at 8-9.  Further, Jones's funding motion simply identified so-called red flags in the record involving matters that were clearly investigated by trial counsel and presented at trial.  Jones did not provide any information that

exceeded what was known to counsel and did not demonstrate a reasonable necessity for the investigation that he requested. He simply sought to re-investigate any and all aspects of trial counsel's 2001 performance under 2008 guidelines. He also failed to demonstrate that funds in excess of the statutory maximum were "necessary to provide fair compensation for services of an unusual character or duration." *See* 18 U.S.C. § 3599(g)(2).

Ms. Brandt has represented Jones since 2008. Mr. Mowla was appointed on February 13, 2014. Both counsel had the time between February 13, 2014, to June 23, 2014, to file the amended petition, request reasonably necessary funding, or make a reasonable request for additional time. Instead, counsel creatively sought to expand the Court's equitable-tolling ruling to include an additional one-year limitations period and requested $30,000 to conduct a full-blown mitigation investigation under standards that do not govern this case. The Court remains convinced that it ruled correctly on the motions for continuance and for funding.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Jones's petition for a writ of habeas corpus. In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), the Court **DENIES** Jones a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right. *See*

*Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*,

529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2).  If Jones


files a notice of appeal, he may proceed in forma pauperis on

appeal. 18 U.S.C. § 3006A(7).

    SIGNED January 13, 2016.


                               _____
                               TERRY R. MEANS
                               UNITED STATES DISTRICT JUDGE

TRM/ks: