IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| QUINTIN PHILLIPE JONES, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | No. 4:05-CV-638-Y |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

ORDER DENYING WITHOUT PREJUDICE MOTION FOR EXPERT FUNDING

Before the Court is Petitioner's motion filed February 22, 2021 (electronic case filing document no. 175), requesting $7500 in funding to retain the services of a mental-health professional, psychologist Dr. John Edens, to testify during Jones's forthcoming state clemency proceeding.

Title 18 U.S.C. Section 3599(f), in conjunction with Section 3599(g)(2), authorizes this Court, with very specific statutory limitations, to authorize counsel appointed in a capital habeas-corpus proceeding to retain the services of investigators and experts if such services are "reasonably necessary." *Nelson v. Davis*, 952 F.3d 651, 666 (5th Cir. 2020); *Jones v. Davis*, 927 F.3d 365, 373 (5th Cir. 2019). In an ordinary federal habeas case, the determination of what is reasonably necessary requires a court to consider (1) the potential merit of the claims to be investigated, (2) the likelihood that the services sought will generate useful and admissible evidence, and (3) the prospect the petitioner will be able to overcome any procedural hurdles standing in the way of a merits determination. *Ayestas v. Davis*, 933 F.3d 384, 388-89 (5th Cir. 2019); *Jones*, 927 F.3d at 373.

In the clemency context, the petitioner must show that the requested investigative or expert services are reasonably necessary to provide the governor and the Texas Board of Pardons and Paroles ("the Board") with the information they need to determine whether to exercise their discretion to extend grace to the petitioner to prevent a miscarriage of justice. *Wilkins v. Davis*, 832 F.3d 547, 552 (5th Cir. 2016) (quoting *Brown v. Stephens*, 762 F.3d 454, 460 (5th Cir. 2014)). A district court may consider the merits of the proposed investigation when deciding whether to grant or deny the funding requested. *Wilkins*, 832 F.3d at 552.   If the proposed investigation or expert testimony would only supplement prior testimony that has already been considered in previous judicial proceedings, it is not generally an abuse of discretion to deny funding because the requested services would not provide the Board and the governor with material information beyond that already adduced. *Id.*

Jones's motion seeking expert funding argues (1) the prosecution's mental-health expert, Dr. Randall Price, erroneously relied upon the Hare Psychopathy Checklist as a basis for his expert opinion that Jones posed a risk of future dangerousness; (2) the Hare Checklist is misleading, unreliable, and unscientific when employed in a capital sentencing context; (3) the lack of efficacy regarding the Hare Checklist in the capital sentencing context is supported by a recent publication or "statement" of more than a dozen respected academics and mental-health professionals, of which Dr. Edens is a leading participant[1]; (4) Dr. Price's reliance on the Hare Checklist was "critical" to his testimony during the punishment phase of Jones's capital murder trial; and (5) no mitigation investigation has ever been undertaken on behalf of Jones.

---

[1]  A copy of the "statement" to which Dr. Edens contributed and which appeared in the January 2020 edition of the journal *Psychology, Public Policy, and Law* is attached to Jones's motion.

Unfortunately for Jones, this Court had undertaken its own, de-novo review of the testimony given during the punishment phase of his capital-murder trial. Most of the assumptions and representations underlying Jones's request for Dr. Edens's expert assistance are refuted by the record from Jones's trial.

At the punishment phase of that trial, it was the defense, not the prosecution, that sought to rely upon the Hare Psychopathy Checklist. More specifically, contrary to Jones's current assertions, his trial counsel was assisted by not one, but two, mental-health experts who each investigated Jones's background for mitigating evidence. Dr. Raymond Finn and Dr. Carol Wadsworth both conducted investigations on behalf of the defense. Dr. Wadsworth furnished Jones's trial counsel with a 2001 report outlining her findings. Dr. Raymond Finn examined Jones and testified for the defense at the punishment phase of trial, arguing that Jones suffered from dissociative identity disorder (in layman's terms multiple personality disorder brought on by severe childhood abuse) and was, therefore, not responsible for his capital offense. Dr. Finn also argued that, based upon his application of the Hare Psychopathy Checklist, Jones's cumulative score of 9.5 to 10 was fairly low on that scale and indicated Jones posed a low risk of future dangerousness. (35 RR 142-44.)

In rebuttal, the prosecution called Dr. Price, who testified on direct examination that, based upon his examination of a detailed record of Jones's long history of multiple violent acts of criminal misbehavior, he believed Jones posed a high risk of future dangerousness, at least until Jones reached age forty and began to "burn out" from his violent tendencies. (36 RR 58-92, 154-55.) On direct examination, Dr. Price testified that he believed Jones possessed a psychopathic personality but his only reference to the Hare Checklist consisted of a single sentence in which he indicated that, contrary to Dr. Finn's findings, in his view Jones's score on the Checklist was a 31,

not a nine or ten.   (36 RR 61.)   Dr. Price also opined that Jones (1) did not display any indications of brain damage, mental disorder, thought disturbance, delusions, or mental illness; (2) had consistently tested for IQ in the nineties to one-hundred range; and (3) had made statements of childhood sexual abuse that were not credible and constituted a form of malingering.   (36 RR 36-56.)

On cross-examination it was the defense that once again brought the Hare Checklist into the forefront, repeatedly asking Dr. Price about the checklist and obtaining concessions from him that the American Psychiatric Association's *Diagnostic and Statistical Manual ("DSM")* did not include a diagnosis for "psychopathy" (Dr. Price admitted the closest diagnosis in the DSM was that of "Antisocial Personality Disorder").   (36 RR 104-05, 116-33, 138-41, 146-52.)

Thus, Jones's assertions that he had never benefited from a mitigation investigation and that it was the prosecution that wrongfully injected the reliability of the Hare Checklist into the punishment phase of his capital-murder trial are factually inaccurate.   It was defense expert Dr. Finn, not Dr. Price, who relied upon the Hare Checklist when addressing the issue of future dangerousness.   Dr. Price relied upon specified instances of violent behavior by Jones over an extended time period to furnish the basis for his professional opinion of future dangerousness. (36 RR 58-92.)   On direct examination, Dr. Price only mentioned the Hare Checklist when asked about Dr. Finn's testimony that Jones had scored only a nine point five to ten on that instrument. (36 RR 61.)   Moreover, Jones's bald assertion that he has never before benefited from a mitigation investigation ignores the fact Dr. Wadsworth prepared a detailed report of her findings regarding Jones and Dr. Finn testified regarding his evaluation of Jones's mental health.   Jones mentions neither of these individuals in his motion.   Accordingly, the Court finds the first, fourth,

and fifth grounds urged by Jones in his motion for funding are refuted by the record and without arguable merit.

Upon turning to Jones's second and third bases for funding--his and Dr. Edens's very persuasive arguments attacking the efficacy of mental-health professionals employing the Hare Psychopathy Checklist in a capital-sentencing context--the focus shifts somewhat.   That is because Jones seeks expert assistance not to present a claim for federal habeas relief but, rather, for the purpose of relief in a state clemency proceeding.

Unlike a federal-habeas corpus proceeding, a state clemency proceeding is not a judicial one.   Instead, it is an executive proceeding in which the petitioner is entitled to present any evidence that would justify the granting of relief by the responsible executive authority (in Texas, the Board makes a recommendation to the governor, who possesses ultimate authority to commute a capital sentence).   *Wilkins*, 832 F.3d at 552.   Obviously, this includes new or additional mitigating evidence, i.e., evidence that reduces the defendant's moral blameworthiness for his capital offense.   A searching inquiry into the defendant's background and mental-health history is ordinarily a necessary concomitant to a state clemency application.

The problems with Jones's motion requesting Dr. Edens's assistance in such an endeavor are legion.   First, Jones offers no explanation as to why, at this late date--so many years after his capital offense and capital murder trial--he believes that a new mental-health evaluation conducted by Dr. Edens or an equally qualified mental-health professional might disclose new or additional mitigating evidence not previously discovered or developed by his trial counsel, his two trial experts (Drs. Finn and Wadsworth), his state appellate counsel, his state habeas counsel, or his federal habeas counsel.   Jones alleges no facts showing that Dr. Edens is any more likely at this juncture than were Drs. Finn or Wadsworth at the time of his trial to discover or develop mitigating

5

evidence.   Valid reasons to believe that a new investigation into Jones's mental health might furnish new mitigating evidence supporting a clemency application may very well exist.   But those reasons have not yet been presented to this Court in intelligible form.

Second, for the reasons discussed above, attacking the efficacy of the prosecution's alleged misuse of the Hare Checklist at Jones's trial is unlikely to furnish new or additional mitigating evidence that could support a clemency application.   Although Dr. Price mentioned the Checklist during his testimony, he did so only to critique Dr. Finn's reliance upon Jones's purported low score on that instrument or in response to defense counsel's cross-examination, which at times seemed to fixate on the checklist, as opposed to the detailed factual basis for Dr. Price's own opinion on future dangerousness.   Jones does not allege there was anything factually inaccurate about Dr. Price's detailed recitation during his testimony of the many acts of violence by Jones that formed the basis for Dr. Price's opinion as to future dangerousness.   Any argument Jones may wish to make before the Board during his clemency proceeding regarding the propriety of expert testimony concerning the Hare Psychopathy Checklist during the punishment phase of his capital murder trial would likely be met by the State with a compelling argument that any such error was invited by the defense.

Third, the $450-per-hour rate of compensation Jones seeks for Dr. Edens is almost double the going rate for professional mental-health services this Court routinely pays for a wide variety of forensic mental-health services ($250 per hour) and greatly exceeds the highest hourly rate this Court can ever recall paying for forensic mental-health services ($350 per hour).

Fourth, Jones's motion appears to be premised upon the assumption that Dr. Edens will be permitted to testify in person before the Board in Austin during the course of Jones's state clemency proceeding.   This assumption is at odds with this Court's understanding of applicable

6

Texas law.   By statute, the Board is not required to meet as a body to consider clemency matters. See TEX. GOVT. CODE § 508.047.   In fact, state statute also permits the Board to hold a hearing in clemency matters by telephone conference.   See TEX. GOVT. CODE § 551.124.   While applicable Board regulations permit an offender seeking clemency to request an interview in support of his application, such interviews are conducted in a non-adversarial setting at the Texas Department of Criminal Justice facility where the inmate is housed.   See 37 TEX. ADMN. CODE § 143.57.   Jones does not cite any instance in recent memory during which a third-party expert, such as Dr. Edens, has been permitted to testify live before the Board in an evidentiary hearing during a state clemency proceeding.

Fifth, it is the Court's understanding that, typically, the Board entertains and makes its recommendations to the governor on applications for clemency in capital cases based entirely upon the written submissions made by the parties.   If this is in fact the case, then the question arises whether submission of a report or affidavit in support of Jones's clemency application from Dr. Edens along the same lines as those he has routinely submitted in state and federal habeas corpus proceedings over the past two decades (as referenced in Jones's motion) would be any more efficacious than it has been in those cases.   In sum, given Dr. Edens's lengthy history of furnishing expert affidavits or reports challenging the use of the Hare Checklist, the Court questions why it is "reasonably necessary" to have him prepare yet another report or affidavit containing what would likely be the same information and opinions as those Dr. Edens has already so eloquently expressed in many prior judicial proceedings.

Sixth, beyond reports and affidavits, Dr. Edens has also presented live testimony regarding his view of the lack of efficacy in a diagnosis of psychopathy in the capital-sentencing context. In addition to the Sampson case cited by Jones in his motion, this Court takes judicial notice of the

7

fact that Dr. Edens also furnished the state habeas court with an affidavit/report as well as live testimony in the state capital-habeas proceeding of Texas death row inmate James G. Broadnax.[2] See *Ex parte James Garfield Broadnax*, WR-81,573-01, 2015 WL 2452758 (Tex. Crim. App. May 20, 2015), *cert. denied*, 136 S. Ct. 77 (2015).   Jones has not explained why appending to his state clemency application copies of Dr. Edens's affidavit/report and transcripts from his live state-habeas testimony in the Broadnax case (as well as transcripts from Dr. Edens's live testimony in other cases and the more recent "statement" of Dr. Edens and other professionals published in January 2020) would be insufficient to adequately challenge the references to the Hare Psychopathy Checklist contained in the punishment phase testimony of Drs. Finn and Price from Jones's capital-murder trial.   In short, a wealth of transcripts of Dr. Edens's live testimony and his reports/affidavits already exists with which Jones can challenge the efficacy of Drs. Finn and Price's reliance on the Hare Psychopathy Checklist during their testimony at Jones's trial.

In conclusion, Jones has failed to allege any facts showing that the proposed services of Dr. Edens would furnish the Board and the governor with any information not already available in either the record from Jones's trial or the many state and federal habeas proceedings in which Dr. Edens has testified or presented affidavits/reports regarding his views on the efficacy of the Hare Checklist in the capital-sentencing context.

Jones's motion for authorization of expert funding, filed February 22, 2021 (doc. no. 175), is DENIED without prejudice.

SIGNED March 10, 2021.

---

[2] The Broadnax case, including the entire state-court record from his state habeas-corpus proceeding (including Dr. Edens's live testimony), was submitted to this Court for review in the federal habeas-corpus proceeding in which this Court denied Broadnax federal habeas-corpus relief.   See *Broadnax v. Davis*, 3:15CV1758-N, 2019 WL 330840 (N.D. Tex. July 23, 2019), *Aff'd* 2021 WL 416426 (5th Cir. Feb. 8, 2021).

_____
TERRY R. MEANS
SENIOR UNITED STATES DISTRIC JUDGE